694 P.2d 281

James L. LANCASTER; John B. Oakes; Minton R. Groves; William D. Binkley; Thomas L. Anton; Robert B. Anderson; William D. DeLoughary; James Lane; Henry T. Wells; Scott Logan; and Norman H. Daily, individually and as class representatives, Plaintiffs/Appellants,

v.

ARIZONA BOARD OF REGENTS; State of Arizona; Gary M. Munsinger; Robert A. Peterson; Charles H. Sakwa; Victor E. Roberson; and Don Olson, Defendants/Appellees.

No. 2 CA–CIV 5063.

Court of Appeals of Arizona, Division 2.

Sept. 5, 1984.

Review Denied Jan. 22, 1985.

Ilene G. Sipe, Tucson, for plaintiffs/appellants.

James L. Richmond, Tucson, and Stephen K. Smith, Phoenix, for defendants/appellees.

## OPINION

BIRDSALL, Chief Judge.

The appellants commenced this action in the superior court for themselves and as representatives of a class by filing a four-count complaint. They are all employees of the University of Arizona, one of three Arizona state universities under control of the appellee Arizona Board of Regents. The individual appellees are officers and directors or assistant directors of various departments within the university, i.e., personnel, physical resources and finance.

In count one, the appellants sought a declaratory judgment setting forth their rights to lost wages, overtime wages, retirement benefits and merit increases and indicating their correct job and pay classifications pursuant to legislation enacted by the Second Regular Session of the 32nd Legislature of the State of Arizona. The specific legislation was enacted as Chapter 60 of those Session Laws and was the result of Senate Bill 1222, as amended.

In count two, the appellants sought a writ of mandamus ordering the assistant director of finance to issue a warrant from the State to pay them all sums to which they were entitled as the result of the appellees' failure to comply with the legislation.

Count three alleged breach of their employment contract with the state and at the university by virtue of which they were to be paid all sums to which they were entitled according to law.

Finally, count four alleged negligence on the part of the appellees resulting in a failure to pay them all wages and benefits to which they were entitled.

The appellees responded to the complaint by filing a motion to dismiss, pursuant to Rule 12(b)(6), Rules of Civil Procedure, 16 A.R.S., for failure to state a claim upon which relief could be granted and based upon the trial court's lack of jurisdiction because the appellants had failed to comply with A.R.S. § 12–821. This statute has been held to require filing a claim with the state as a condition precedent to an action in contract. *Clark v. State Livestock Sanitary Board,* 131 Ariz. 551, 642 P.2d 896 (App.1982); *Dassinger v. Oden,* 124 Ariz. 551, 606 P.2d 41 (App.1979). Since matters other than the pleadings were presented to and not excluded by the court, the motion to dismiss was treated as one for summary judgment. The trial court granted the motion, thereby dismissing the complaint in its entirety, and this appeal followed.

In its under advisement minute entry granting the motion to dismiss, the trial court reasoned as follows:

The Court reviewed thoroughly the legislative history and enactment of Chapter 60, Senate Bill 1222, which became law on May 27, 1976, recognizing that it offers no express private right of action to anyone, with a view to determining whether, since no enforcement provisions are provided, a private cause of action might be implied.

Since the legislature is a separate branch of government Courts generally take a restrictive approach to implying private rights of action, presuming that had the legislature intended to create such a right it would have so specified.

It appears that the sole objective of S.B. 1222 was to require the Board of Regents to submit to the legislature a report "on a plan to establish a system of

equivalent wages and salaries ..." No private remedy is expressed in S.B. 1222. Neither under all of these circumstances is a private right of action implicit.

Because no private right of action exists by S.B. 1222 there is no basis for the Declaratory Judgment relief sought in Count I of the complaint nor for the Mandamus relief sought in Count II.

Count III of the indictment incorporates all allegations of Counts I and II and alleges breach of contract, though without alleging any specific contract of any plaintiff with the defendants, requesting for all plaintiffs "all sums to which they were entitled according to law."

Count IV of the complaint incorporates all allegations of Counts I, II and III and alleges negligence by the defendants in failing to adjust plaintiffs' wages to comply with S.B. 1222.

Plaintiffs have not alleged in their complaint compliance with A.R.S. § 12–821 which is necessary to this Court's having jurisdiction. But even assuming *arguendo* that compliance with A.R.S. § 12–821 is satisfied by the claim letter submitted to the Board of Regents after the filing of the complaint and denied at their meeting of September 10, 1983, so that this Court had jurisdiction of the contract and negligence claims, it appears that no cause of action is stated in these counts independent of S.B. 1222 and with no private right of action in S.B. 1222 it follows that Counts III and IV also fail to state a cause of action.

In this appeal, it is contended that the trial court erred in dismissing counts one, two and three and that the action should have been certified as a class action pursuant to Rule 23, Arizona Rules of Civil Procedure, 16 A.R.S. No issue is presented concerning the dismissal of the negligence count.

We affirm.

As originally proposed, S.B. 1222 might have constituted a basis for the complaint. It was originally entitled:

AN ACT RELATING TO EDUCATION; PROVIDING FOR EQUIVALENT SALARIES FOR CERTAIN EMPLOYEES AMONG STATE UNIVERSITIES, AND AMENDING SECTION 15–725, ARIZONA REVISED STATUTES.

The original draft provided in pertinent part:

Be it enacted by the Legislature of the State of Arizona:

Section 1. Section 15–725, Arizona Revised Statutes, is amended to read:

15–725 *General administrative powers of board*

A. The board shall

\*   \*   \*   \*   \*   \*

4. ESTABLISH POSITION CLASSIFICATIONS BY JOB DESCRIPTION FOR ALL EMPLOYEES AND SUPERVISORY PERSONNEL NOT SPECIFIED IN PARAGRAPH 3 OF THIS SUBSECTION AND PRESCRIBE THAT EQUIVALENT SALARIES SHALL BE PAID AT ALL UNIVERSITIES TO EMPLOYEES AND SUPERVISORY PERSONNEL AT EACH LEVEL WITHIN THEIR POSITION.

This version of the bill was radically altered by the House Committee on Education. As a result, the bill as ultimately enacted, instead of "PROVIDING FOR EQUIVALENT SALARIES FOR CERTAIN EMPLOYEES AMONG STATE UNIVERSITIES," was entitled:

AN ACT RELATING TO EDUCATION; \* \* \*; PRESCRIBING CERTAIN POWERS OF BOARD OF REGENTS; *PROVIDING THAT BOARD OF REGENTS SHALL MAKE CERTAIN REPORT TO THE LEGISLATURE,* AND AMENDING SECTIONS 15–690, 15–691 AND 15–725, ARIZONA REVISED STATUTES. (Emphasis added)

Section 4 in the original version was amended and as finally enacted read:

Sec. 4. *Report on the development of a system of wage and salary equivalency*

The Board of Regents shall report to the legislature on or before January 15,

1977, on a plan to establish a system of equivalent wages and salaries for all employees and supervisory personnel, other than presidents, vice-presidents, deans, professors, instructors, lecturers, fellows, and other officers, at all universities. The plan shall include the establishment of uniform job and position classifications, equivalent salary and wage scales within such classifications, and uniform job and position descriptions. The report shall include a description of existing job and position classifications, wage and salaries established, and existing job and position descriptions on a comparative basis for all universities. The report shall also include a plan for the implementation of the system such that not less than twenty-five per cent of the employees and supervisory personnel at each university shall receive equivalent wages and salaries pursuant to such system by July 1, 1977, and not less than twenty-five per cent of the employees and supervisory personnel shall be covered under the system within each six-month period thereafter and that on or before July 1, 1979, all employees and supervisory personnel will be covered under such system, together with the estimated cost of the adoption of such system.

By letter dated January 7, 1977, the executive coordinator of the Arizona Board of Regents reported to the legislature that it was not practically possible to devise a plan that would meet the literal requirements of Senate Bill 1222. In his "Conclusions," he stated:

\*      \*      \*      \*      \*      \*

... At this point, having completed the project, we cannot in all good conscience recommend the implementation of SB-1222 specifically as written, for the reasons which are discussed below.

A.  Some employees receive pay boosts only because their job happened to match one at another university—others do not.

B.  Salaries of employees on jobs that matched at another university are increased above those of employees on jobs of the same quality at the same university.

C.  Under their differing pay schedules, the "corrected" situation will certainly become "disproportionate" again.

D.  The appropriation required to meet SB-1222 is too large, especially when considering:

1.  Evidence shows that U–A employees, who are not discontent and have not asked for more pay, get the bulk of the money; whereas a segment of NAU employees, who were verbal about it, are due very little; and ASU employees are neither upset nor underpaid. (Actually sizable increase adjustments were made by NAU in early 1976.)

2.  A significant portion of the money would go to U–A custodians who are paid competitively in their own local labor market and who are not complaining. Such payment would disturb the local market in Tucson and upset other U–A employees.

3.  Large appropriations of public tax money could create adverse reactions in today's economy, particularly where the need does not seem to be justified.

His "Recommendations" addressed some of the problems he identified, with reference to local labor markets, annual surveys of those markets in each university area, and the need to assure fair internal pay scale differences at all three universities.

In response to the report, the legislature appropriated the requested sum of $356,-427.00. Of this amount, $285,649.00 was distributed to the three universities and actually expended; the balance of $70,-778.00 reverted to the general fund.

By January 1980 the Board of Regents had completed a comprehensive plan which was approved by the legislature and accepted by the state Department of Administration as evidenced by the appropriation and release, respectively, of $1,746,600.00 for implementation of the plan.

The Board of Regents having complied with the mandate of Senate Bill 1222 to the apparent satisfaction of the legislature, Chapter 60, Section 4 of the 1976 Session Laws survives only within the "Historical Note" to A.R.S. § 15–1626.

The comprehensive plan submitted by the Board of Regents pursuant to the legislative mandate was entitled "Arizona Universities Personnel System for Classified Personnel, 1/18/80," later identified as "Arizona Universities Compensation Plan" (AUCP), hereinafter, the Plan. It contained four lettered sections, A. Introduction, B. Generic Position Titles (for example, Accountant I), C. Salary Grades and Ranges, and D. Fund Requirements. A code number and grade were assigned to each generic position title. For example, Accountant I was given Code 2U000.001 14. The salary range for grade 14 was fixed at $11,930 minimum, $18,383 maximum. Twenty-one grades were established and the Fund Requirements, Section D of the plan, was for grade-range adjustments for salary grades 1–21.

Significantly the introduction, Section A of the Plan, explained, in pertinent part, how the Plan would be implemented.

As the current positions on each campus have been crossed over and attached to the new generic titles and salary grades, careful attention has been given to consistent treatment on each of the three campuses.

A number of functional positions on each of the campuses have been assigned to each generic title during the crossover to the new system. The basic prerequisites for assignment of these positions to generic titles were that the work elements require:

1. Similar academic knowledge
2. Similar manual skills
3. Similar work processes
4. Similar training and preparation

When a particular individual was placed on the salary grade appropriate to a generic title, the entry level salary was designated if the current salary is below the entire range of the new pay grade.

If the current salary of the individual is higher than the entry level of the appropriate salary grade, the individual will maintain his current salary.

\*   \*   \*   \*   \*   \*

Approximately 45 percent of the individuals within the classified personnel ranks covered by this proposed system have been designated through the crossover to receive an upward revision of their salaries.

\*   \*   \*   \*   \*   \*

It is not necessary that each university adopt precisely the same procedures and regulations for all aspects of classified personnel management. However, a set of generalized Regent policies applicable to the three universities will insure that consistent, though not necessarily identical, policies are provided through local institutional initiative.

Thus, it is readily apparent that the Plan presented to and approved by the legislature left a wide range of discretion with the Board of Regents and the three universities including the University of Arizona. In fact the Plan itself shows that only 45 percent of the classified employees in all three universities were designated to receive salary increases, thus leaving 55 percent who were not so designated. The appellants were in this 55 percent since their affidavits filed in support of their opposition to the motion imply that they have not received upward salary adjustments as a result of the implementation of the Plan.

In addition to the foregoing, the appellees supported their motion to dismiss with the affidavit of H. Charles Sakwa, director of personnel at the University of Arizona. True copies of the University "Staff Personnel Policy Manual", pertinent to the Plan and the board of Regents Policy Manual relating to "Hiring Practices" were identified as a part of the affidavit. Without detailing pertinent portions of these documents, suffice it to say that they each contain provisions giving the University, through designated officials, broad discre-

tion with regard to the actual rate of pay to be given classified employees within the established salary ranges.

The appellants' contentions of error find support only if the legislation, including the approved plan, give an individual appellant a right to an increase in pay. They do not. The declaratory judgment, the writ of mandamus and the contract count were all properly dismissed because the appellants have no claim upon which relief can be granted.

■ The sole and exclusive purpose of Section 4, Chapter 60, as reflected in its title and section heading, was to require the preparation of a report for submission to the legislature by the Board of Regents. The plain terms of the section itself confine the duty imposed by the board to prepare a report by a certain date. By restricting the duty imposed by the enactment to making a report to the legislature, and devising a plan for legislative implementation, the legislature precluded a private right of action for damages and other relief in the courts brought by third persons. "When a statute enumerates the subjects upon which it is to operate it will be construed as excluding from its effect all subjects not specially mentioned." *Inspiration Consolidated Copper v. Industrial Commission,* 118 Ariz. 10, 12, 574 P.2d 478 (App.1978); *See also Lewis v. Industrial Commission,* 93 Ariz. 324, 380 P.2d 782 (1963).

■ By the same principle, the enactment's specification that the report was to be made to the legislature for legislative implementation necessarily precludes private judicial enforcement by third persons who are incidental beneficiaries of the contemplated report. The duty imposed upon the Board of Regents to prepare a report contained the correlative right by the legislature alone to receive the report and act upon it. As the United States Supreme Court held in *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979):

... [The Act] simply proscribes certain conduct, and does not in terms create or alter any civil liabilities. If monetary liability to a private plaintiff is to be found, it must be read into the Act. Yet it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it. "When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode". [Citations omitted] 444 U.S. at 19–20, 100 S.Ct. at 246–47.

Because Section 4 of Chapter 60 creates only a right, vested in the legislature alone, to receive a report on a particular subject by a specified date, it "does not in terms create or alter any civil liability". The statute "limits a thing to be done in a particular mode" and thus negates any other mode or remedy by private parties. Plainly negated through the specification of a strictly legislative right is a private right of action by employees of the state colleges and universities in the courts of Arizona predicated upon the act.

■ Thus, the act creates only an executive duty to prepare and a legislative right to receive a report. It defines a process for which the legislative assembly, rather than individuals who might benefit incidentally, constituted "the class for whose *especial* benefit the statute was enacted." *See City of Tucson v. Superior Court of Pima County,* 127 Ariz. 205, 208, 619 P.2d 33 (App.1980). At most, the employees of Arizona's colleges and universities possessed expectation under the act that at some future time the legislature would either approve the plan submitted by the regents or revise it to suit the legislature's own desire, but Section 4 of Chapter 60 did not create in and of itself, apart from future legislative enactment, a right to equal pay and a private cause of action to enforce such a right. Implication of a private right of action is clearly inconsistent with the underlying purpose of the act. As our Supreme Court stated in *State Board of Barber Examiners v. Walker,* 67 Ariz. 156, 164, 192 P.2d 723 (1948):

... The Supreme Court of Florida in *Mayo v. American Agricultural Chemical Co.*, 101 Fla. 279, 133 So. 885, lays down a statutory rule. "Omission on final enactment of clause of [the] bill originally introduced is strong evidence that [the] Legislature did not intend [the] omitted matter should be effective ..." [This] principle we believe is controlling in the instant case.

The same situation is presented here. The Senate version of the bill, requiring "that equivalent salaries shall be paid," was rejected in favor of the House version requiring submission of a plan for a university-wide personnel system. No statute similar to the Senate version that was rejected prior to adoption of Senate Bill 1222 has ever been enacted, nor has there been any further legislative directive on the subject to the Board of Regents. The legislative history and implementation of the enactment negate the idea that an implied, private right of action in favor of third persons was created by it, and buttress the proposition that no such private right of action was intended by the legislature.

Settled rules of statutory construction provide further support for this understanding. Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction, especially where such a declaration coincides with and thus confirms the construction of a statute by those charged with its execution. *Police Pension Board of the City of Phoenix v. Warren*, 97 Ariz. 180, 186–187, 398 P.2d 892 (1965).

The joint action of the Arizona Legislature and the Arizona Board of Regents in implementing Section 4, Chapter 60 is evidence that it created only a duty to report and a correlative right to approve or reject such a report. This is the antithesis of an implied right of action in third parties. It is clear from the joint administration and implementation of the enactment by the legislature and the regents that no such implied right of action exists.

Appellants contend that the appellees agreed to pay all sums to which appellants were entitled "according to law", citing A.R.S. § 38–601. That section, provides that state employees "... shall receive the salary provided by law, and shall not, under any pretext, receive any salary or emolument in excess of the salary so provided." In the absence of any salary required by Senate Bill 1222, there is no "salary provided by law" shown in the record. The appellants contend that the January 1977 report to the legislature which resulted in an initial appropriation of $356,427 establishes a salary or pay increase to which they were entitled. We disagree. That report recommended deletion of the requirement that the plan for implementation of the system be such that not less than 25 percent of the employees receive equivalent wages by July 1, 1977, and 25 percent more be covered each six-month interval thereafter, so that by July 1, 1979, all were covered. Instead the report recommended that one comprehensive compensation plan be adopted. This plan was to specifically:

A.—Have a standard job description covering the same job at all three schools.

B.—Study and construct a job grade and description hierarchy for each separate family of jobs (for example, all computer-related jobs; all custodial jobs; all secretarial jobs, etc.), which will be used by all three universities.

C.—Develop and use one common pay policy manual, with standard procedures which will allow the handling of local labor market problems, such as hiring rates, etc., where necessary.

D.—Maintain annual salary surveys of the labor markets of each university area to assure fair wages.

E.—Develop and use a pay structure plan and policy which will assure fair internal pay scale differences between jobs of differing value, skill requirements, etc., at all three universities.

F.—Select, for priority handling, classifications which we have already determined to have the greatest inter-uni-

versity wage rates disparities. (For example, custodians, police and skilled trades would be handled first). Pay adjustments should be made to those classifications which are paid below the local area average rates. Classifications representing at least one fourth of all non-academic employees of all three universities will be completed each six (6) months, beginning 7-1-77, according to the above plan. Work will begin immediately.

G.—Finance the necessary adjustments for the two, 6-month segments beginning 7-1-77 via the appropriation of $356,427, the amount needed to cover 7-1-77 and 1-1-78 adjustments under the original SB-1222 procedure (see III-D and IV-B). The appropriation should be handled by the Board of Regents, to be dispensed to any university, as findings dictate. This figure represents only about 45% of the fiscal outlay ($790,022) required under Plan A, the original SB-1222 procedure.

The legislature accepted the recommendation contained in the report as evidenced by the appropriation of the $396,427. The compensation plan was then submitted in January 1980 and the next appropriation was made that year.

The appellants who are all custodians, policemen or skilled trade employees at the University of Arizona point to subparagraph F of the 1977 report. Therefore, they argue, they were to receive wage increases on a priority basis. In their affidavits filed in opposition to the motion for summary judgment, they each aver that similar employees at Arizona State University were paid a higher wage than the affiant and that the average wage in the Tucson area was higher than the affiant was paid. The affidavits were all signed in August and September 1983. We do not believe these qualified statements in the 1977 report, combined with the affidavits, show that the appellants were entitled as a matter of law to wage increases. The report left the appropriation to be handled by the Board of Regents to be dispersed "as findings dictate". Even assuming that in

1977 some custodians, police and skilled tradesmen at the University of Arizona were paid less than similar workers at Arizona State University and less than similar positions in the Tucson community, this does not show that a greater discrepancy did not exist at Northern Arizona University or in the Phoenix or Flagstaff areas. The report does not promise or require that all University of Arizona custodians, police or skilled tradesmen would be prioritized. Those employees at all three schools who would benefit by the appropriation were yet to be selected. As we have noted, the introduction to the later 1980 comprehensive plan states that only 45 percent of the personnel have been designated to receive salary increases.

Finally the appellants contend that the "Staff Personnel Policy Manual" of the University of Arizona must be considered a part of their employment contract, citing *Leikvold v. Valley View Community Hospital*, 141 Ariz. 575, 688 P.2d 201 (App. 1983). That opinion of Division One of the Court of Appeals was vacated by our supreme court, on April 25, 1984, 141 Ariz. 544, 688 P.2d 170. We are obliged to consider this issue in light of the supreme court opinion. The supreme court held that an employer's representations in a personnel manual can become terms of an employment contract and can limit an employer's ability to discharge employees. At 172. Since the manual in *Leikvold* set forth certain termination policies which the plaintiff alleged were not followed and the manual might have been a part of the plaintiff's contract, the supreme court reversed the summary judgment entered by the trial court.

We reject the appellant's arguments since nothing in the record shows that the appellants ever saw the manual. The manual by its terms is directed to supervisory personnel and is unlike the manual in *Leikvold* which was provided to that employee with an admonition that it was to be explicitly followed. Furthermore, as we have already observed, the manual in the instant

case does not contain a sufficient specification of terms to create enforceable contract rights. *See Savoca Masonry Company, Inc. v. Homes and Son Construction Company, Inc.*, 112 Ariz. 392, 542 P.2d 817 (1975).

Determination of specific compensation related to job performance, under the terms of the manual, is the responsibility of supervisors and department heads. Appellants' argument that the Policy Manual affords a basis for their claim for breach of contract is not supported by the content of the manual.

Since we hold that the complaint was properly dismissed, the class action certification question is moot and need not be addressed.

Affirmed.

HATHAWAY and HOWARD, JJ., concur.