214 P.3d 397

Alejandro CHAVEZ; Sonja Elison; Judy Leiken; Thomas W. Ryan, Plaintiffs/Appellants,

v.

Janice K. BREWER, in her official capacity as Secretary of State for the State of Arizona; Lenora Johnson, in her official capacity as Recorder for Apache County; Apache County; Candace D. Owens, in her official capacity as Recorder for Coconino County; Coconino County; Linda Haught Ortega, in her official capacity as Recorder for Gila County; Gila County; Berta Manuz, in her official capacity as Recorder for Greenlee County; Greenlee County; Shelly Baker, in her official capacity as Recorder for La Paz County; La Paz County; Helen Purcell, in her official capacity as Re-corder for Maricopa County; Maricopa County; Joan McCall, in her official capacity as Recorder for Mohave County; Mohave County; Laurette Justman, in her official capacity as Recorder for Navajo County; Navajo County; F. Ann Rodriguez, in her official capacity as Recorder for Pima County; Pima County; Laura Dean–Lytle, in her official capacity as Recorder for Pinal County; Pinal County; Suzanne Sainz, in her official capacity as Recorder for Santa Cruz County; Santa Cruz County; Ana Wayman–Trujillo, in her official capacity as Recorder for Yavapai County; Yavapai County; Susan Hightower Marler, in her official capacity as recorder for Yuma County; Yuma County, Defendants/Appellees.

No. 1 CA–CV 06–0575.

Court of Appeals of Arizona, Division 1, Department A.

July 21, 2009.

---

Perkins Coie Brown & Bain, P.A. By Paul F. Eckstein, Charles A. Blanchard, Michael T. Liburdi, Rhonda L. Barnes, Lauren J. Lowe, Phoenix, Lowell Finley, Berkeley. Attorneys for Plaintiffs/Appellants.

Terry Goddard, Attorney General By Carrie J. Brennan, Assistant Attorney General, Wilenchik and Bartness, P.C., Phoenix By Dennis I. Wilenchik and Kathleen E. Rapp, Andrew P. Thomas, Maricopa County Attorney, By Colleen Connor, Deputy County Attorney, Phoenix, Attorney for Defendants/Appellees.

## OPINION

HALL, Judge.

¶ 1 Alejandro Chavez, Sonja Elison, Judy Leiken, and Thomas W. Ryan (collectively, appellants) appeal from the trial court's order dismissing their complaint against Janice K. Brewer, in her official capacity as Secretary of State, Apache County, Coconino County, Gila County, Greenlee County, La Paz County, Maricopa County, Mohave County, Navajo County, Pima County, Pinal County, Santa Cruz County, Yavapai County, and Yuma County, and each of the official Recorders for the named counties (collectively, appellees). Contrary to the determination by the trial court, we conclude that the political question component of the separation of powers doctrine does not preclude judicial review of appellants' claim that Secretary Brewer abused her authority in certifying for use two voting machines that appellants assert do not comply with Arizona statutes. We further hold that appellants have an implied private right of action to claim that the voting machines do not comply with applicable statutory requirements. Finally, we conclude that appellants have stated viable claims under Article 2, Section 21 (Free and Equal Elections), and Article 2, Section 13 (Privileges or Immunities) of the Arizona Constitution, but have not stated a cognizable claim under Article 7, Section 12 (Purity of Elections). Therefore, we vacate the trial court's order in part, affirm it in part, and remand the case for further proceedings on the remaining claims in the complaint.

## FACTS AND PROCEDURAL HISTORY

¶ 2 Following the constitutional crisis triggered by Florida's use of outdated punch card technology in the 2000 presidential election, the United States Congress enacted the

Help America Vote Act of 2002 (HAVA) to improve the administration of elections. 42 U.S.C. §§ 15301 to 15545 (2002). Pursuant to HAVA, the federal government appropriated funding to enable each state to replace punch card or lever voting machines. 42 U.S.C. §§ 15301(b)(1)(F), 15302(b)(1)(A). In addition, HAVA established minimum election administration standards for state and local governments, including requirements that each polling place provide "at least one direct recording electronic voting system or other voting system equipped for individuals with disabilities" and that the voting system "provide alternative language accessibility." 42 U.S.C. § 15481(a)(3)(B), (a)(4). States were required to comply with HAVA no later than January 1, 2006. 42 U.S.C. § 15481(d).

¶ 3 During the subsequent four years, the Arizona Legislature amended and enacted several statutes to effectuate HAVA. Among these changes, the legislature amended Arizona Revised Statutes (A.R.S.) section 16–442(A) to require that the secretary of state determine the voting machines that are "certified for use" in elections.[1] 2003 Ariz. Sess. Laws, ch. 260, § 9 (1st Reg.Sess.). The legislature also amended the process for selecting electronic voting machines by requiring that the secretary of state certify only voting machines that "comply with [HAVA]" and requiring that all election machines or devices be "tested and approved by a laboratory that is accredited pursuant to [HAVA]." *Id.;* A.R.S. § 16–442(B) (2006). The legislature also authorized the secretary of state to revoke the certification of any voting system that fails to meet the new standards. 2003 Ariz. Sess. Laws, ch. 260, § 9; 2005 Ariz. Sess. Laws, Ch. 144, § 2; A.R.S. § 16–442(C), (D).

¶ 4 In addition, the legislature enacted A.R.S. § 16–442.01 (2006), 2004 Ariz. Sess. Laws, ch. 290, § 1 (effective January 1, 2006), which requires in subsection A that voting systems used in the state (with certain

exceptions, including cities and towns of less than twenty thousand people) must provide persons who are blind or visually impaired with "access to voting that is equivalent to that provided to persons who are not blind or visually impaired." To implement this requirement, subsection C requires the secretary of state to consult with and obtain recommendations for voting equipment from nonprofit organizations representing the blind and visually impaired and other persons with expertise in accessible software, hardware, and other technology. After receiving these recommendations, the secretary of state must submit to the committee appointed pursuant to § 16–442(A) one or more voting systems that provide "equivalent access" for its review and recommendation to the secretary for possible certification. A.R.S. § 16–442.01(C). As further explained in § 16–442.01(B)(1), a voting system provides equivalent access when it allows the voter "to cast and verify by both visual and nonvisual methods all of the selections that were made." Nonvisual methods for casting and verifying selections made on a voting system include "the use of synthesized speech, braille and other output methods that do not require sight." A.R.S. § 16–442.01(B)(2).

¶ 5 Pursuant to this statutory scheme, Secretary Brewer engaged in the following voting equipment selection process. She commissioned a study in 2004 of the available direct recording electronic (DRE) voting systems. The result of the study, the Voting Action Plan report, was posted on the Secretary's website and published in March 2005. As required by § 16–442(A), the Secretary also appointed a bipartisan three-member committee to investigate and test recording and tabulation devices and make recommendations on certification for the Secretary's consideration. Before making its certification recommendations, the committee solicited input from disability advocacy groups[2]

---

1. Section 16–442(A) requires the secretary of state to appoint a committee of three persons to investigate and test various types of voting machines or devices and make recommendations to the secretary, who then makes "final adoption" of the types that are "certified for use" in Arizona elections. The committee consists of "a

member of the engineering college at one of the universities, a member of the state bar of Arizona and one person familiar with voting processes in the state, no more than two of whom shall be of the same political party."

2. The Secretary invited the following advocates for individuals with disabilities to serve as advi-

and technology experts. *See* A.R.S. § 16–442.01(C).

¶ 6 After consulting with the election committee, the machines selected by the Secretary were submitted to HAVA-approved "independent testing authorities" for testing and approval. Based on the committee's recommendations, the Secretary also adopted a decertification procedure, which she then submitted to the Department of Justice for preclearance. The Department of Justice approved the Secretary's decertification, certification, and conditional certification procedures.

¶ 7 In March 2005, the Secretary began drafting a Request for Proposal (RFP) to solicit bids for HAVA-compliant voting machines. After submitting two preliminary drafts of the RFP to county election directors for their review and comment, the Secretary issued the final RFP on September 20, 2005. In September 2005, the Secretary appointed an evaluation committee, comprised of four members of the Secretary's staff and three county members, to review the bids and select a vendor or vendors to supply the counties with accessible voting equipment. One of the key considerations in selecting accessible voting equipment for each county was its compatibility with the optical scan voting systems already in place.[3] On December 30, 2005, contracts to supply accessible voting equipment were awarded to Sequoia for Maricopa County, ES & S Auto-MARK for Cochise and Graham Counties, and Diebold for all other Arizona counties.

¶ 8 On May 10, 2006, appellants filed a verified complaint for declaratory, injunctive, and mandamus relief against appellees. Appellant Alejandro Chavez is a naturalized United States citizen who primarily speaks Spanish; appellant Sonja Elison has low vision; appellant Judy Leiken has multiple sclerosis; and appellant Thomas W. Ryan has a Ph.D. in electrical engineering. All are qualified electors in either Pima or Maricopa County. In their complaint, appellants assert that two of the DRE voting machines selected by the Secretary of State, the Diebold AccuVote TSx and the Sequoia Edge II Plus, do not satisfy Arizona's statutory "requirements for accuracy and disability access and [ ] present unacceptable risks of inaccuracy, vote manipulation, and malfunction." The complaint is based on numerous factual allegations regarding supposed deficiencies in the Diebold and Sequoia DRE machines, including: 1) the failure of both machines to include technology permitting people with various disabilities (for example, vision-related impairments, mobility- and dexterity-related impairments, cognitive impairments, and various combinations of each) to vote privately and independently; 2) the use of "interpreted code" that makes both machines more vulnerable to security breaches, or "hacking," which can alter election results; 3) a relatively high number (when compared with optical scan systems) of "undervotes," "phantom votes," and "switched votes,"[4] 4) the Voter Verified Paper Audit Trail (VVPAT), which is intended to allow voters to verify their selections before casting their votes, and is also used for manual audits and

---

sory members to the committee: Pam Allen, National Federation of the Blind and A Bridge to Independent Living; Rebecca Bailey, Arizona Commission for the Deaf and Hard of Hearing; Ginny Clark–Wright, Self Help for the Hard of Hearing; Teresa Moore, Governor's Council on Developmental Disabilities; Edward Myers, III, Northern Arizona University Adaptive Technology Project; and Peri Jude Radecic, Arizona Center for Disability Law.

3. As explained by Joseph Kanefield, the state election director, in a declaration filed in the trial court, see ¶ 10 *infra*, a major component of testing at HAVA laboratories is end-to-end functionality testing to ensure that all of the components of a voting system work well together. For example, according to Kanefield, Pima County

cannot use the ES & S AutoMARK machine certified for use by the Secretary because the Diebold optical scan equipment and election management system already in place in Pima County have not been approved by a HAVA laboratory in combination with the ES & S AutoMARK.

4. As explained in the complaint, an "undervote" occurs on a voted ballot when a vote is not recorded for a particular race. A "phantom vote" occurs when there are more votes counted for a particular office or ballot issue than the number of voters who actually voted. A "switched vote" occurs when the voter attempts to vote for candidate X, but the screen indicates a vote for candidate Y instead.

recounts, is printed on thermal roll paper that is fragile and easily alterable, "making it difficult, if not impossible, to use for manual audits and recounts," and the machines are not equipped with any accommodations permitting blind and low-vision voters to know what is on the VVPAT, without relying on a third party to read it to them; and 5) the Sequoia machine does not always accurately record votes while in Spanish-language mode.

¶ 9 In their claims for relief, appellants sought a declaratory judgment that the Diebold and Sequoia DRE machines violate the following statutory and constitutional provisions: A.R.S. § 16–447(A) (requiring that each polling place in the state be equipped with at least one voting machine that meets the disability access requirements of HAVA); A.R.S. § 16–446(B)(6) (requiring that an electronic voting system shall "[w]hen properly operated, record correctly and count accurately every vote cast"); Arizona Constitution, Article 7, Section 12 (providing that registration and other laws be enacted "to secure the purity of elections"); Arizona Constitution, Article 2, Section 21 (requiring that "elections shall be free and equal" and that "no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage"); and Arizona Constitution, Article 2, Section 13 (prohibiting the enactment of any law "granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which ... shall not equally belong to all citizens or corporations"). Appellants also sought a writ of mandamus ordering the appellees to "put in place voting machines that comply with Arizona statutory and constitutional provisions." Appellants further sought both permanent and preliminary injunctions prohibiting appellees from using the selected electronic voting equipment "for any election in the State." [5] Appellants separately filed a motion for preliminary injunction containing a declaration from one of their attorneys to which were attached twenty-two documents-including articles and declarations of four experts in the fields of computer security, disability access, and voting technology-supporting their request to prevent appellees from using the Diebold and Sequoia machines in the then upcoming 2006 statewide elections on the basis that they were non-compliant with HAVA.[6]

¶ 10 Secretary Brewer filed a motion to dismiss (in which the counties joined) contending that the trial court was not authorized "to determine what voting equipment counties must use." Specifically, she argued that "the separation of powers doctrine prevents courts from usurping the decisions of elected officials on matters entrusted exclusively to them" and maintained that neither the constitution nor any statutory provision permitted judicial review of her voting equipment decision. Secretary Brewer also claimed that appellants' complaint was barred by laches because appellants failed to pursue an administrative remedy and "unreasonabl[y] delay[ed]" filing their complaint. Secretary Brewer also filed a response in opposition to appellants' request for a preliminary injunction arguing that the legislature "expressly vested" the responsibility to certify and decertify voting equipment in the secretary of state, removing such decisions from the realm of judicial review. She attached several exhibits to her response, including a declaration of the state election director detailing the selection process and the Arizona Voting Equipment Certification report prepared by her office. Appellants filed a consolidated response to the Secretary's motion to dismiss and reply in support of their motion for a preliminary injunction to which they attached several exhibits, including a declaration of the supervisor of elections for Leon County, Florida, asserting that the ES & S AutoMARK voting machine is more secure and provides greater access

**5.** The Diebold AccuVote TSx is used in twelve Arizona counties, and the Sequoia Edge II Plus is used in Maricopa County. These machines are touch-screen DREs—voters make their choices by touching a screen. Appellants did not sue Cochise and Graham counties, which use the ES & S AutoMARK voting machine. The Auto-MARK machine operates by allowing voters to use an electronic device that marks their votes on a paper ballot that is then read by an optical scan machine.

**6.** Although the 2006 election has passed, appellants' request for injunctive relief applied to all subsequent elections as well.

for private and independent voting by people with a broader range of disabilities than do the Diebold and Sequoia machines.

¶ 11 At oral argument on the parties' respective motions, appellants denied they were asking the trial court to substitute its judgment for Secretary Brewer's and acknowledged that, to prevail on the merits, they needed to demonstrate that Secretary Brewer acted in an arbitrary and capricious manner in selecting the voting machines at issue. *See Ariz. State Highway Comm'n v. Superior Court*, 81 Ariz. 74, 79, 299 P.2d 783, 786 (1956) (remedy by mandamus is not available to compel highway commission to exercise its discretion in a particular way unless its refusal to do so is clearly arbitrary and capricious); *Yes on Proposition 200 v. Napolitano*, 215 Ariz. 458, 465, ¶ 12, 160 P.3d 1216, 1223 (App.2007) ("When an official has discretion about how to perform a function, mandamus is available to require him to act properly[ ] only if the official abuses that discretion." (internal quotation omitted) ). Appellants then submitted that the inadequacies of the machines manifested that. Secretary Brewer acted arbitrarily and capriciously in selecting them.

¶ 12 After taking the matter under advisement, the trial court entered a signed minute entry denying appellants' motion for a preliminary injunction and granting the Secretary's motion to dismiss. The trial court stated:

> In effect, [appellants] are asking this court to substitute its opinion for those experts and others who have participated in the process. The process was thorough, exhaustive, complex, neutral, and fair. This court is of the opinion that it is more appropriate to exercise judicial restraint and leave the policy decisions in the hands of those empowered to make the decisions.

¶ 13 Appellants timely appealed. We have jurisdiction pursuant to A.R.S. § 12–2101(B) (2003).

## DISCUSSION

¶ 14 Appellants argue that the trial court erred by dismissing their complaint, choosing to exercise judicial restraint based on what it characterized as the "exhaustive" process in which Secretary Brewer engaged rather than determining whether the voting machines she selected met the substantive statutory requirements. In response, the Secretary asserts that the trial court properly dismissed appellants' complaint because judicial review would violate the separation of powers doctrine, that appellants do not have a private right of action, and that each of appellants' claims for relief should be dismissed on the merits.[7] We discuss each claim in turn.

## I. Separation of Powers

¶ 15 Appellants contend that "when a constitutional or statutory provision directs a state officer to perform a task, the judiciary has the power to review that officer's actions to ensure that they comply with the law." The Secretary counters that her selection of particular voting equipment is "akin to a political question" and the separation of powers doctrine bars the judiciary from reviewing her decision-making. Although not saying so explicitly, the trial court clearly relied on the separation of powers doctrine. After commenting that the process engaged in by the Secretary "was thorough, exhaustive, complex, neutral, and fair," the court decided to "exercise judicial restraint" by "leav[ing] the policy decisions in the hands of those empowered to make the decisions."

¶ 16 "The federal political question doctrine flows from the basic principle of separation of powers and recognizes that some decisions are entrusted under the federal constitution to branches of government other than the judiciary." *Kromko v. Ariz. Bd. of Regents*, 216 Ariz. 190, 192, ¶ 12, 165 P.3d 168, 170 (2007) (citing *Baker v. Carr*, 369 U.S. 186, 210–11, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). "Nowhere in the United States is [separation of powers] more explicitly and firmly expressed than in Arizona." *Mecham v. Gordon*, 156 Ariz. 297, 300, 751 P.2d 957,

7. The county appellees filed an opening brief asserting their status as nominal parties who take no position on the merits.

960 (1988). Indeed, the Arizona Constitution expressly provides that the legislative, executive, and judicial branches "shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others." Ariz. Const. art. 3.

¶ 17 We conclude that judicial review of the Secretary's determination regarding which voting machines to certify for use in Arizona is not a political question implicating the principle of separation of powers. First, although as the Secretary notes, her office is part of the executive branch pursuant to Article 5, Section 1(A), the Constitution does not set forth the powers and duties of the secretary of state, but provides that they "shall be as prescribed by law." Ariz. Const. art. 5, § 9; *see also* A.R.S. § 41–121 (2004) (listing the duties of the secretary of state). That the authority to certify voting machines is not constitutionally committed to the secretary of state but is prescribed as one of her duties by the legislature is an important factor in our determination that judicial review of her actions is not inappropriate. *See Baker,* 369 U.S. at 217, 82 S.Ct. 691 (stating that "[p]rominent on the surface of any case held to involve a political question is found a textually demonstrable *constitutional* commitment of the issue to a coordinate political department" (emphasis added) ); *County of Oneida v. Oneida Indian Nation of N.Y.,* 470 U.S. 226, 249 n. 24, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (stating that Congress' delegation to the President of certain matters involving Indian affairs was not a "textually demonstrable *constitutional* commitment," but "rather a statutory commitment of authority" (internal quotation marks omitted) ).

¶ 18 Second, although they have dressed several of their claims in constitutional garb, the crux of appellants' complaint is that Secretary Brewer improperly certified two electronic voting machines in violation of statutes enacted by the legislature. In these circumstances, the judiciary has the authority to construe the statutory scheme involving electronic voting equipment and declare what the law requires. *See Forty–Seventh Legislature v. Napolitano,* 213 Ariz. 482, 485, ¶ 8, 143 P.3d 1023, 1026 (2006) (declining to treat as a political question the legislature's claim that a veto by the governor exceeded her authority: "To determine whether a branch of state government has exceeded the powers granted by the Arizona Constitution requires that we construe the language of the constitution and declare what the constitution requires." (citing *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.") ); *see also Banfield v. Cortes,* 922 A.2d 36, 44 (Pa.Commw.Ct.2007) (holding the separation of powers doctrine did not preclude judicial review of the secretary of state's certification of electronic voting systems and whether he complied with a legislative enactment).

¶ 19 *Kromko* does not require a different result. In that case, four students enrolled at the University of Arizona filed a complaint, on behalf of themselves and as representatives of the putative class of all students, against the Board of Regents and the Legislature alleging that the 2003–04 tuition rate increase violated Article 11, Section 6, of the Arizona Constitution, which provides that "the instruction furnished" at state universities shall "be as nearly free as possible." 216 Ariz. at 191, ¶¶ 1, 5, 165 P.3d at 169. The Board countered that the case presented a nonjusticiable political question. *Id.* at 192, ¶ 10, 165 P.3d at 170. The supreme court agreed with the Board, stating it could "conceive of no judicially discoverable and manageable standards ... by which [to] decide such issues .... [A]t best, we would be substituting our subjective judgment of what is reasonable ... for that of the Board and Legislature, the very branches of government to which our Constitution entrusts this decision." *Id.* at 194, ¶ 21, 165 P.3d at 172.

¶ 20 Here, unlike *Kromko,* there is not a lack of judicially discoverable or manageable standards to resolve this controversy. To the contrary, the legislature has enacted statutes setting forth in detail the procedure the secretary of state must follow in selecting the voting machines and the substantive requirements for the electronic voting equipment. *See, e.g.,* A.R.S. §§ 16–442.01, –446. Thus, the circumstances here are more similar to

those in *Roosevelt Elementary School District No. 66 v. Bishop*, 179 Ariz. 233, 877 P.2d 806 (1994), in which the supreme court concluded that a statutory funding scheme for public education violated the "general and uniform" requirement in Article 11, Section 1. Although the state did not assert in *Roosevelt* that the constitutional claim was a nonjusticiable political question, the court's decision "rested on the premise that there were judicially discoverable and manageable standards for determining whether the school system was 'general and uniform.'" *Kromko*, 216 Ariz. at 195, ¶ 24, 165 P.3d at 173.

¶ 21 In summary, we reject the Secretary's argument that her certification of voting machines for use in Arizona is a political question that is inappropriate for judicial review. Because we cannot affirm the trial court's dismissal based on the separation of powers doctrine, we now consider whether we may nonetheless affirm the trial court on other grounds. *See Mutschler v. City of Phoenix*, 212 Ariz. 160, 162, ¶ 8, 129 P.3d 71, 73 (App. 2006) ("We will affirm the trial court's ruling if the court was correct for any reason.").[8]

## II. Private Right of Action

■■■ ¶ 22 Relying on federal case law holding that HAVA does not provide for a private right of action under federal law, *see, e.g., Taylor v. Onorato*, 428 F.Supp.2d 384, 386 (W.D.Pa.2006) (holding that HAVA does not provide a private right of action to enforce the mandates of 42 U.S.C. § 15481 pertaining to voting system standards), the Secretary argues that "it would be illogical to find" that A.R.S. §§ 16–446 and –447 permit a remedy not available under HAVA. Thus, the Secretary maintains that the only "reme-

dy for a state's non-compliance with HAVA is its loss of federal funding, not a private lawsuit." *See* 42 U.S.C. § 15512 (requiring states receiving federal funding to establish a procedure allowing persons alleging violations of HAVA to file complaints); *see also* 42 U.S.C. § 1551 (giving the Attorney General the right to bring a civil action against any state not in compliance with HAVA).

¶ 23 Appellants counter that the Arizona electronic voting equipment statutes implicitly provide for a private right of action. Specifically, appellants contend that a private right of action exists given the purpose of the statutes and further claim that "the only way for the voters to enforce the statute[s] requiring a secure, accurate and accessible voting system in each polling place is to bring a private action."

¶ 24 Because the Arizona Legislature has incorporated HAVA's requirements as a part of our state's broader statutory scheme regulating voting equipment, A.R.S. § 16–442(B), we are not bound by federal case law construing HAVA in determining whether appellants have an implied right of action. *Cf. Keizor v. Sand Springs Ry. Co.*, 861 P.2d 326, 329–30 (Okla.App.1993) (applying federal case law to determine whether to imply a private cause of action in state court for a violation of a federal law). Instead, we rely on Arizona case law, which unlike the federal rule that generally prohibits recognition of a private right of action unless the relevant statute is both "phrased in terms of the persons benefited" and "manifests an intent to create not just a private *right* but also a private *remedy*," *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) (internal quotation omitted), more

---

8. Our holding that the judiciary should not abstain from resolving the issues raised by appellants has no bearing on the level of deference that the trial court should extend the Secretary in ruling on appellants' claims that she acted arbitrarily and capriciously in violation of applicable constitutional and statutory provisions. *See Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n*, 220 Ariz. 587, 685, ¶ 27, 208 P.3d 676, 684 (2009) (quoting *Hartung v. Bradbury*, 332 Or. 570, 33 P.3d 972, 980–81 (2001) ("In reviewing a plan of reapportionment, this court is not privileged to substitute its judg-

ment about the wisdom of the plan.... Rather, our task is to determine whether the Secretary of State has complied with [all applicable law]."); *see also Schade v. Maryland Bd. of Elections*, 401 Md. 1, 930 A.2d 304, 326 (2007) ("It is our view that the selection and certification of a uniform voting system, a function that we agree ... to be a matter of policy or quasi-legislative in nature, taking into consideration the nature of the statutory requirements which give the State Board broad discretion to weigh various factors and ultimately decide on a system, should be reviewed under the 'arbitrary and capricious' standard.").

broadly implies such a right when consistent with "the context of the statutes, the language used, the subject matter, the effects and consequences, and the spirit and purpose of the law." *Transamerica Fin. Corp. v. Superior Court*, 158 Ariz. 115, 116, 761 P.2d 1019, 1020 (1988).

¶ 25 The legislature neither expressly granted nor prohibited a private right of action in the statutory scheme governing electronic voting machines. Therefore, to determine whether appellants may maintain an action under the electronic voting equipment statutes, we must consider whether such a right is consistent with the context, language, subject matter, effects, and purpose of the statutory scheme. *See Napier v. Bertram*, 191 Ariz. 238, 240, 954 P.2d 1389, 1391 (1998).

¶ 26 In *Transamerica*, the supreme court held that the Consumer Loan Act provided an implied private right of action. 158 Ariz. at 116, 761 P.2d at 1020. To reach this holding, the supreme court focused on the "spirit and purpose" of the loan laws, which is "to protect borrowers." *Id.* Because a determination that a loan contract is void under the Act "only inures to the benefit of an individual borrower," the supreme court concluded that "a private right of action is contemplated by the legislature for enforcement of this individual right, even though other sections of the Act provide for administrative action for enforcement of its regulatory scheme." *Id.* at 117, 761 P.2d at 1021.

¶ 27 In contrast, we held in *Lancaster v. Arizona Board of Regents*, 143 Ariz. 451, 454–55, 457, 694 P.2d 281, 284–85, 287 (App. 1984), that a legislative enactment requiring the Board of Regents to prepare a report for the legislature on the development of a system of wage and salary equivalency did not provide an implied private right of action. In that case, employees of the University of Arizona brought an action against the Board of Regents seeking a declaratory judgment setting forth their right to lost wages. *Id.* at 453, 694 P.2d at 283. We inferred that the "sole and exclusive purpose" of the legislative enactment was to require the Board of Regents to prepare and submit a report to the legislature, creating a legislative right to re-

ceive the report, but not creating a right for those "individuals who might benefit incidentally" from the report. *Id.* at 457, 694 P.2d at 287. Because the plaintiffs were not members of "the class for whose *especial* benefit" the enactment was intended, they could not pursue any private rights under it. *Id.* (citation omitted).

¶ 28 Here, the overall purpose of the voting machine statutes is to ensure the administration of fair and accurate elections and effectuate HAVA. To achieve this goal, the legislature enacted some statutes that clearly benefit individuals with disabilities. For example, § 16–442.01 sets forth voting systems criteria designed to guarantee blind and visually impaired voters the opportunity to vote. In addition, § 16–442 provides that only machines that comply with HAVA may be approved, incorporating HAVA's requirement that each polling place provide at least one voting system equipped for individuals with disabilities and accessible to voters in alternative languages. 42 U.S.C. § 15481(a)(3)(B), (a)(4). Thus, similar to the statutes at issue in *Transamerica*, the focus of these statutes is protecting the rights of individuals. Moreover, unlike the plaintiffs in *Lancaster*, appellants are not "incidental" beneficiaries of the statutes, but members of "the class for whose especial benefit" the statutes were adopted. Therefore, we hold that appellants have an implied right to maintain their statutorily based claims for relief.

## III. Viability of the Constitutional Claims

### 1. Article 7, Section 12.

¶ 29 Appellants assert that the Diebold and Sequoia DRE machines violate Arizona voters' rights to "purity of elections" under Article 7, Section 12, claiming that "such machines are highly vulnerable to tampering, do not accurately count and record votes, and do not allow for proper auditing and recount of ballots." Article 7, Section 12 provides in full: "There shall be enacted registration and other laws to secure the purity of elections and guard against abuses of the elective franchise." As our supreme

court has previously recognized, this provision is a direction to the legislature to enact appropriate laws to secure the purity of elections and guard against electoral abuses. *See Harless v. Lockwood,* 85 Ariz. 97, 100–01, 332 P.2d 887, 888–89 (1958); *Ahrens v. Kerby,* 44 Ariz. 337, 341, 37 P.2d 375, 377 (1934). Appellants do not claim that Secretary Brewer's choice of voting machines was attributable to the failure of the legislature, our lawmaking body, to enact necessary laws to secure the purity of elections. We therefore agree with the Secretary that appellants' dissatisfaction with the voting equipment that she certified for use is not grounds for relief under Article 7, Section 12.

### 2. Article 2, Section 21.

■ ¶ 30 Article 2, Section 21, requires that "elections shall be free and equal" and that "no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Appellants assert that the Diebold and Sequoia DRE machines certified for use by Secretary Brewer are not HAVA-compliant because they are not accessible to individuals with disabilities in a manner that provides them the same opportunity for access and participation, including privacy and independence, as nondisabled voters. *See* 42 U.S.C. § 15481(a)(3)(A). They assert that the machines thereby violate the Arizona statutory requirements that the Secretary may only certify for use voting machines that comply with HAVA, A.R.S. § 16–442(B), and that every county provide "at each polling place at least one device that complies with [HAVA] and that 'is certified by the secretary of state for use by voters with disabilities." A.R.S. § 16–447(A). Appellants allege that "requir[ing] some voters to vote on such a flawed and insecure system while others vote on a safer, more accurate system would result in a drastically unequal election."

¶ 31 The Secretary argues that appellants' concerns regarding the accuracy of the voting machines are too speculative because no actual harm has yet occurred and that there is no constitutional right to an election free from all error. *See Ross v. Kozubowski,* 182 Ill.App.3d 687, 131 Ill.Dec. 248, 538 N.E.2d

623, 627 (1989) (explaining that Illinois' constitutional provision guaranteeing a "free and equal" election "does not guarantee an election devoid of all error"). Therefore, according to the Secretary, appellants have not stated a claim upon which relief may be granted. *See* Ariz. R. Civ. P. 12(b)(6).

¶ 32 There is no Arizona case law interpreting what protections the framers intended by the "free and equal" election guarantee in Article 2, section 21. To determine the intent of the framers, we first examine the plain language of the provision involved. *Am. Fed'n of State, County and Mun. Employees, AFL–CIO, Local 2384 v. City of Phoenix,* 213 Ariz. 358, 363, ¶ 15, 142 P.3d 234, 239 (App.2006). If the constitutional provision is "clear on its face and is logically capable of only one interpretation, we simply follow that text." *Id.* "When a constitutional or statutory provision is not clear, we may look to the context, subject matter, historical background, effects, consequences, spirit, and purpose of the law." *Id.* Finally, "[w]e strive to interpret a constitutional provision or statute in a manner that gives meaning to all of its language." *Id.*

¶ 33 Other states with similar constitutional provisions have generally interpreted a "free and equal" election as one in which the voter is not prevented from casting a ballot by intimidation or threat of violence, or any other influence that would deter the voter from exercising free will, and in which each vote is given the same weight as every other ballot. For example, the Illinois Supreme Court has stated:

> An election is free where the voters are exposed to no intimidation or improper influence and where each voter is allowed to cast his ballot as his own conscience dictates. Elections are equal when the vote of each voter is equal in its influence upon the result to the vote of every other elector-where each ballot is as effective as every other ballot.

*Moran v. Bowley,* 347 Ill. 148, 179 N.E. 526, 531 (1932). The Court of Appeals of Kentucky long ago announced that "no election can be free and equal ... if any substantial number of persons entitled to vote are denied the right to do so." *Wallbrecht v. Ingram,*

320

164 Ky. 463, 175 S.W. 1022, 1026–27 (1915). And the Supreme Court of New Mexico interpreted that state's analogous "free and open" clause as requiring a "ballot [that] allows the voter to choose between the lawful candidates for that office." *Gunaji v. Macias*, 130 N.M. 734, 31 P.3d 1008, 1016 (2001).

¶ 34 We conclude that Arizona's constitutional right to a "free and equal" election is implicated when votes are not properly counted. *See* A.R.S. § 16–446(B)(6) ("An electronic voting system shall ... [w]hen properly operated, record correctly and count accurately every vote cast."). We further conclude that appellants may be entitled to injunctive and/or mandamus relief if they can establish that a significant number of votes cast on the Diebold or Sequoia DRE machines will not be properly recorded or counted. *See Banfield*, 922 A.2d at 48 (determining that electors challenging the secretary of state's certification of certain DREs (including the Diebold AccuVote TSx and the Sequoia AVC Edge II) stated a legally sufficient claim in a mandamus action under Pennsylvania's "free and equal" guarantee when they alleged that the secretary's selection would make it "likely that a significant number of votes will not be counted accurately, or at all"). Because appellants have set forth sufficient factual allegations in their complaint that, if true, might entitle them to relief under Article 2, Section 21, they may proceed on this claim in the trial court. *Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417, 419, ¶ 7, 189 P.3d 344, 346 (2008) (stating that courts "must [ ] assume the truth of the well-pled factual allegations and indulge all reasonable inferences therefrom" when adjudicating a Rule 12(b)(6) motion to dismiss).

### 3. Article 2, Section 13.

¶ 35 Article 2, Section 13, Arizona's Privileges or Immunities Clause, provides: "No law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations." It is substantially the same in effect as the Equal Protection Clause in the United States Constitution. *Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n*, 211 Ariz. 337, 345 n. 10, 121 P.3d 843, 851 n. 10 (App.2005).

¶ 36 Appellants claim that appellees' use of the Diebold and Sequoia DRE machines impermissibly burdens their right to vote, thereby violating Arizona voters' equal protection rights, by requiring Arizona voters in the counties using those machines "to cast their ballots on less accurate and less secure voting machines." The Secretary concedes that the right to vote is fundamental, *see Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 ("It is beyond cavil that voting is of the most fundamental significance under our constitutional structure." (internal quotation omitted) ), but asserts that the process that led to the certification of the Diebold and Sequoia DRE machines does not violate the Equal Protection Clause because it was both reasonable and nondiscriminatory, and was justified by important state regulatory interests, *see id.* at 433–34, 112 S.Ct. 2059 (recognizing that "[e]lection laws will invariably impose some burden upon individual voters" and distinguishing between state election laws that impose "severe restrictions" on voting rights and those that impose "reasonable, nondiscriminatory restrictions" (internal quotations omitted) ). *See Crawford v. Marion County Election Bd.*, 553 U.S. 181, 128 S.Ct. 1610, 1615–24, 170 L.Ed.2d 574 (2008) (lead opinion) (applying "flexible standard" in deciding whether the burden that Indiana's photo identification law imposed on a discrete class of voters violated the Equal Protection Clause by weighing the asserted injury to the right to vote against the relevant and legitimate state interests justifying the limitation).

¶ 37 In support of her position that appellants are not entitled to relief under Article 2, Section 13, the Secretary relies on *Weber v. Shelley*, 347 F.3d 1101 (9th Cir.2003), in which the Ninth Circuit upheld the federal district court's judgment rejecting a voter's claim that the use of a touchscreen voting system violated her equal protection rights by infringing on her fundamental right to vote. *Id.* ("recognizing that 'there must be a substantial regulation of elections if they are to be fair and honest,' and that states have

broad leeway in 'enact[ing] comprehensive and sometimes complex election codes ... [that] govern[ ] ... the voting process itself" (quoting *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) ) ); *see also Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n,* 220 Ariz. 587, 683–84, ¶ 19–20, 208 P.3d 676, 684, (2009) (recognizing that courts customarily pay substantial deference to a "considered decision of a coequal and representative branch of our Government" (internal quotation omitted) ). However, unlike here, the Ninth Circuit in *Weber* was reviewing a summary judgment rendered following a consideration of the merits of the voter's claims. Although *Weber* and other similar cases suggest that appellants may have a difficult time establishing their entitlement to relief,[9] we cannot say at this stage of the proceedings that appellants' equal protection claim is subject to dismissal pursuant to Rule 12(b)(6) as legally insufficient.

## IV. Attorneys' Fees on Appeal

¶ 38 Appellants have requested their attorneys' fees on appeal pursuant to A.R.S. § 12–2030 (2003) and the private attorney general doctrine. Attorneys' fees are awarded under § 12–2030(A) when a party "prevails by an adjudication on the merits in a civil action brought by the party against the state." Under the private attorney general doctrine, a court may, in its discretion, "award attorney's fees to a party who has vindicated a right that: (1) benefits a large number of people; (2) requires private enforcement; and (3) is of societal importance." *Arnold v. Ariz. Dep't of Health Servs.,* 160 Ariz. 593, 609, 775 P.2d 521, 537 (1989). At this point in the litigation, appellants have neither prevailed on the merits nor vindicated a right, and we decline to grant their request for attorneys' fees. Appellants may pursue their request for fees, including those

on appeal, in the trial court at the conclusion of the case.

## CONCLUSION

¶ 39 Based on the foregoing, we vacate the trial court's order of dismissal in part, affirm it in part, and remand the case for further proceedings consistent herewith.

CONCURRING: MAURICE PORTLEY and PETER B. SWANN, Judges.

---

9. *See Schade, supra,* n. 8 (affirming trial court's denial of motion for preliminary injunction seeking to enjoin use of DRE voting system); *Am. Ass'n of People with Disabilities v. Shelley,* 324 F.Supp.2d 1120, 1128 (C.D.Cal.2004) (applying a rational basis analysis in denying motion for preliminary injunction seeking to invalidate decision by California secretary of state to decertify certain DRE voting systems and holding that voters were not deprived of their fundamental right to vote in violation of the Equal Protection Clause "notwithstanding the possibility that the [decision] may have an unintentional discriminatory effect on the ability of disabled persons to cast their votes in private").