257 P.3d 181

PLANNED PARENTHOOD ARIZONA, INC., an Arizona non-profit corporation, Plaintiff/Appellee,

v.

AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS; Catholic Medical Association; Christian Medical and Dental Associations; Christian Pharmacists Fellowship International; Ave Maria Pharmacy, PLLC; Arizona Catholic Conference; Crisis Pregnancy Centers of Greater Phoenix; Senator Linda Gray; Representative Nancy Barto, Applicant Intervenors–Defendants/Appellants.

Planned Parenthood Arizona, Inc., an Arizona non-profit corporation, Plaintiff/Appellee,

v.

Thomas C. Horne, in his official capacity as Attorney General; Arizona Medical Board; Lisa Wynn, in her official capacity as Executive Director of the Arizona Medical Board; Arizona Board of Osteopathic Examiners in Medicine and Surgery; Elaine Letarte, in her official capacity as Executive Director of the Arizona Board of Osteopathic Examiners in Medicine and Surgery; and Ken Bennett, Arizona Secretary of State, in his official capacity, Defendants/Appellants,

and

Kirk D. Adams, as Speaker, Arizona House of Representatives, Intervenor–Defendant/Appellant,

and

American Association of Pro–Life Obstetricians & Gynecologists; Catholic Medical Association; Christian Medical and Dental Associations; Christian Pharmacists Fellowship International; Ave Maria Pharmacy, PLLC; Arizona Catholic Conference; Crisis Pregnancy Centers of Greater Phoenix; Senator Linda Gray; Representative Nancy Barto, Intervenors–Defendants/Appellants.

Nos. 1 CA–CV 09–0748, 1 CA–CV 10–0274.

Court of Appeals of Arizona, Division 1, Department B.

Aug. 11, 2011.

Planned Parenthood Federation of America by Jennifer Sandman, pro hac vice, Eve C. Gartner, pro hac vice, New York, N.Y., Greenberg Traurig, LLP by Lawrence J. Rosenfeld, Daniel B. Pasternak, Phoenix, Co-counsel for Plaintiff/Appellee.

Thomas C. Horne, Arizona Attorney General by David R. Cole, Solicitor General, Paula S. Bickett, Chief Counsel, Civil Appeals, Carrie J. Brennan, Assistant Attorney General, Timothy A. Nelson, Chief Deputy Attorney General, Phoenix, Attorneys for State Defendants/Appellants.

Office of the Speaker, Arizona House of Representatives by Peter A. Gentala, Phoenix, Cantelme & Brown, P.L.C. by David J. Cantelme, Phoenix, Co-counsel for Intervenor–Defendant/Appellant Kirk D. Adams.

Alliance Defense Fund by Steven H. Aden, pro hac vice, Matthew S. Bowman, pro hac

vice, Washington, D.C., Center for Arizona Policy by Deborah M. Sheasby, Cathi W. Herrod, Phoenix, Bioethics Defense Fund by Nikolas T. Nikas, Scottsdale, Co-counsel for Intervenor–Defendants/Appellants American Association of Pro–Life Obstetricians and Gynecologists; Catholic Medical Association; Christian Medical and Dental Associations; Christian Pharmacists Fellowship International; Ave Maria Pharmacy, PLLC; Arizona Catholic Conference; Crisis Pregnancy Centers of Greater Phoenix; Senator Linda Gray; Representative Nancy Barto.

## OPINION

SWANN, Judge.

¶ 1 This case requires us to decide whether four statutory provisions that regulate the performance of abortions violate the equal protection or privacy clauses of the Arizona Constitution. The trial court granted Planned Parenthood of Arizona ("PPAZ") a preliminary injunction barring the enforcement of portions of A.R.S. §§ 36–2152 through –2155. We hold that the statutes at issue would withstand federal constitutional scrutiny, and that the Arizona Constitution–to the extent it protects abortion rights at all–offers no greater protection than the federal constitution with respect to the regulations at issue in this case. Because we hold that the statutes in question are constitutional, we reverse the decision of the trial court, vacate the injunction and remand.

¶ 2 In addition, the speaker of the Arizona House of Representatives ("Speaker") and a group of other persons and entities ("Proposed Intervenors")[1] appeal the denial of their Motions to Intervene. We reverse in part and affirm in part the trial court's denial of leave to intervene.

---

1. The other intervenors are: Ave Maria Pharmacy, Christian Medical and Dental Associations, Christian Pharmacists Fellowship International, American Association of Pro–Life Obstetricians and Gynecologists, Catholic Medical Association, Arizona Catholic Conference, Crisis Pregnancy Centers of Greater Phoenix, and legislators Linda Gray and Nancy Barto.

2. The facts presented in this summary are uncontroverted.

*FACTS AND PROCEDURAL HISTORY*[2]

¶ 3 On July 13, 2009, the Governor signed House Bill 2564 and Senate Bill 1175, which amended A.R.S. §§ 36–2151 through –2155. 2009 Ariz. Sess. Laws ch. 172, §§ 2–5; ch. 178, § 1 (1st Reg. Sess.). The laws were scheduled to take effect on September 30, 2009, 90 days after the legislature adjourned *sine die* on July 1, 2009.

¶ 4 PPAZ provides family planning services in Arizona, including abortions. On September 14, 2009, PPAZ filed a seven-count complaint against various state officials (collectively, the "state") for declaratory and injunctive relief under the Arizona Constitution. PPAZ also applied for a temporary restraining order or preliminary injunction enjoining enforcement of some of the statutory provisions challenged in its complaint. In its application, PPAZ argued only that the statutes at issue violated the equal protection and privacy clauses of the Arizona Constitution.[3] PPAZ contended that the challenged provisions were subject to strict scrutiny, but that they would fail under "any level of review" because they did not "further any legitimate state purpose."

¶ 5 On September 23, 2009, Proposed Intervenors moved to intervene under Arizona Rules of Civil Procedure ("Rule") 24(a)(2) and (b).[4] On September 29, 2009, the trial court denied Proposed Intervenors' motion to intervene on the grounds that they "have shown no injury to a private right or to themselves personally and have not shown that their interests will be inadequately represented by the Attorney General." Proposed Intervenors timely appeal that ruling.

¶ 6 On September 30, 2009, after hearing oral argument, the trial court issued an injunction enjoining enforcement of the chal-

---

3. PPAZ did not challenge the statutes under the federal constitution.

4. PPAZ has failed to serve the president of the Arizona senate, and therefore the president may have "any finding of unconstitutionality" vacated. A.R.S. § 12–1841(D). Because we do not hold that any of the challenged provisions are unconstitutional, PPAZ's failure is harmless at this time.

lenged provisions. The order, as amended, enjoined the enforcement of:

A. [A.R.S. §§ 36–2153(A)(1) and (A)(2) ] to the extent that they require certain information to be given to a woman "orally and in person," as opposed to by telephone or other means;

B. [A.R.S. § 36–2153(A)(1) ] to the extent that it requires certain information to be given to a woman by "the physician who is to perform the abortion or the referring physician," as opposed to by a qualified staff member;

C. [A.R.S. § 36–2153(A)(1) ] to the extent that it requires certain information to be given to a woman by "the physician who is to perform the abortion or the referring physician," even when the abortion is a "nonsurgical abortion" and it is performed by a registered nurse practitioner or physician assistant, as permitted by law;

D. [A.R.S. § 36–2153(C) (nonphysicians may not perform surgical abortions) ];

E. S.B. 1175 [also codified as A.R.S. § 36–2153(C) ];

F. [A.R.S. § 36–2154 (refusal provisions) ] to the extent it amends existing law; and

G. [A.R.S. § 36–2152(A) ] to the extent that it requires a "notarized statement" of parental consent, unless and until the Arizona Secretary of State gives adequate and ongoing notice to all Notary Publics in the state of their confidentiality obligations with respect to notarial acts involving parental consent to abortion, and establishes penalties for violation.

¶ 7 On November 5, 2009, the Speaker filed a motion to intervene as of right pursuant to Rule 24(a) and A.R.S. § 12–1841(A). After briefing and oral arguments, the court denied the Speaker's motion, interpreting A.R.S. § 12–1841(A) as granting the Speaker only the right to participate as an amicus curiae. The Speaker timely appeals.

¶ 8 On the state's motion, the trial court issued findings of fact and conclusions of law—essentially adopting PPAZ's proposals—that (1) strict scrutiny is the appropriate standard for reviewing legislation that "affect[s]" a fundamental right; (2) *Simat Corp. v. Ariz. Health Care Cost Containment Sys.*, 203 Ariz. 454, 56 P.3d 28 (2002), held that statutes affecting the fundamental right to choose abortion are subject to strict scrutiny; and (3) the privacy clause in Article 2, Section 8, of the Arizona Constitution provides "greater privacy rights" than the U.S. Constitution, including "the right of an individual to 'chart his or her own plan of medical treatment.'" The state timely appeals. We have jurisdiction pursuant to A.R.S. § 12–2101(F)(2).

## DISCUSSION

¶ 9 We review the grant of a preliminary injunction for abuse of discretion, which can take the form of misapplication of the law to the facts. We review a statute's constitutionality de novo, beginning with the presumption that it is constitutional. The party challenging the statute bears the burden of establishing that it is unconstitutional—"any doubts are resolved to the contrary." *Ariz. Dep't of Pub. Safety v. Super. Ct.*, 190 Ariz. 490, 494, 949 P.2d 983, 987 (App.1997). We must accord the statute "the deference that we customarily must pay to the duly enacted and carefully considered decision of a coequal and representative branch of our Government." *Ariz. Minority Coal. for Fair Redistricting v. Ariz. Ind. Redistricting Comm'n*, 220 Ariz. 587, 595, ¶ 20, 208 P.3d 676, 684 (2009) (quoting *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 319, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985)) (internal quotation marks omitted). Therefore, unless a statute offends "the essence of [a] fundamental right" or involves a suspect classification, we presume that the legislature acts constitutionally, and will uphold a statute unless it is clearly unconstitutional. *Id.* at 595 n. 7, ¶¶ 20–21, 208 P.3d at 684 n. 7.

## I. THE PRIVACY CLAUSE AND ABORTION RIGHTS

¶ 10 Because the preliminary injunction before us addressed only PPAZ's claims under the equal protection and privacy clauses of the Arizona Constitution, we confine our

analysis to the legal merits of the injunction on those theories.

¶ 11 The trial court concluded that "the fundamental right that gives rise to strict scrutiny in *Simat* is the right to choose abortion in general." From this proposition, PPAZ reasons that any law affecting the exercise of abortion rights is subject to strict scrutiny under the privacy clause. We disagree.

¶ 12 First, PPAZ's argument is contrary to the plain text of *Simat*, which reads:

> [This case] is not about the right to an abortion ... [or] about whether the Arizona Constitution provides a more expansive abortion choice than the federal constitution.... *The narrow and only question decided* is this: Once the state has chosen to fund abortions for one group of indigent, pregnant women for whom abortions are medically necessary to save their lives, may the state deny the same option to another group of women for whom the procedure is also medically necessary to save their health?

203 Ariz. at 455, ¶ 3, 56 P.3d at 29. Rather than establishing strict scrutiny under the state constitution for laws affecting the right to abortion itself, *Simat* "arose because the legislature chose to provide medically necessary treatment to one class of pregnant citizens and to withhold medically necessary treatment from another class of pregnant citizens." *Id.* at 458, ¶ 14, 56 P.3d at 32. Under the statute at issue in that case, the agency that provided Medicaid services was to fund abortion services that were necessary to save the life of a woman or in cases of rape or incest, but was forbidden from funding abortion services needed to preserve the woman's health. *Id.* at 455–56, 458, ¶¶ 1, 4, 14, 56 P.3d at 29–30, 32. It was therefore the discriminatory *classification*, not any direct burden on the right to abortion, that gave rise to the *Simat* court's application of strict scrutiny to invalidate the statute before it: when the "right to equal treatment" is implicated by restrictions on the exercise of a fundamental right, "our constitution requires that [a] strict scrutiny analysis be applied." *Id.* at 458–59, ¶ 16, 56 P.3d at 32–33.

■ ¶ 13 *Simat* held that strict scrutiny applied under the state constitution because the legislative classification affected the fundamental right to abortion as it exists under the *federal* constitution. *Id.* But *Simat* stopped short of holding that the privacy clause of the Arizona Constitution guarantees any specific right to abortion. Indeed, the court "[did] *not* hold that Arizona's right of privacy entitles citizens to subsidized abortions." 203 Ariz. at 458, ¶ 13, 56 P.3d at 32. *Simat* recognized that the privacy clause has been held to guarantee Arizonans the right "to care for their health and to choose or refuse the treatment they deem best for themselves." *Id.* at n. 2, 56 P.3d at 32, n. 2 (citing *Rasmussen v. Fleming*, 154 Ariz. 207, 741 P.2d 674 (1987) (allowing person in chronic vegetative state to choose termination of treatment over life)).[5] But while the court thereby acknowledged that the clause has force in the arena of individual medical decisionmaking, it did not hold that the privacy clause or any other part of the Arizona Constitution specifically confers abortion rights, and if it does, to a greater extent than the federal constitution. The court noted: "We reach no conclusion about whether the Arizona Constitution provides a right of choice, let alone one broader than that found in the federal constitution." *Simat*, 203 Ariz. at 463, ¶ 35, 56 P.3d at 37. Here, of necessity we must determine whether any right under the Arizona Constitution to abortion is greater than that under the

---

5. PPAZ reads *Rasmussen* as establishing a "fundamental" privacy right to "chart one's medical course." We find that reading overbroad. In *Rasmussen*, our supreme court recognized that even "the right to refuse medical treatment is not absolute." 154 Ariz. at 216, 741 P.2d at 683. The state has a "justifiably strong interest" in "preserving life" that limits that right, *id.*, but when the "treatment at issue serves only to prolong a life inflicted with an incurable condition" like Rasmussen's chronic vegetative state, that interest "must yield" to the patient's right. *Id.* at 216–17, 741 P.2d at 683–84 (internal quotation marks omitted). And *Rasmussen* did not involve abortion, which is "inherently different from other medical procedures, because no other procedure involves the purposeful termination of a potential life." *Harris v. McRae*, 448 U.S. 297, 324–26, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (upholding federal statute prohibiting use of Medicaid funding for some medically necessary abortions.)

federal constitution. But we, like *Simat*, need not, and do not, reach the question of whether there is any right at all to abortion protected by the Arizona Constitution.[6]

¶ 14 Abortion rights find no mention in the text of Article 2, Section 8, and "the records of the Arizona constitutional convention contain no material addressing [that section's] intent." *Hart v. Seven Resorts Inc.*, 190 Ariz. 272, 277, 947 P.2d 846, 851 (App.1997). Furthermore, PPAZ does not contend that the history and traditions of Arizona support abortion rights beyond those guaranteed by the federal constitution. If greater protections are to be found in the Arizona Constitution than are found in the federal one, we agree with the Idaho Supreme Court that they must be "based on the uniqueness of our state, our Constitution, and our long-standing jurisprudence." *State v. Donato*, 135 Idaho 469, 20 P.3d 5, 8 (2001). Therefore, to establish that a fundamental right to abortion exists in Arizona that is superior to the federal right, PPAZ must show that right is explicitly or implicitly protected by the Arizona Constitution, or that it is "deeply rooted" in Arizona's "history and tradition ... and implicit in the concept of ordered liberty such that neither liberty nor justice would exist if [the right was] sacrificed." *See Standhardt v. Super. Ct.*, 206 Ariz. 276, 280, ¶ 11, 77 P.3d 451, 455 (App.2003).

¶ 15 To be sure, the drafters of the Arizona Constitution deliberately created an individual right of privacy that is not expressly set forth in the federal Bill of Rights. But the specific and limited regulations here, substantial equivalents of which have already been held not to offend the penumbral right of privacy that gave rise to federal abortion rights, do not implicate fundamental rights that are in any way unique to Arizona, its history or the intent of the framers of its Constitution. The fundamental rule of judicial restraint is to avoid constitutional questions unless "absolutely necessary" to decide

the case. *Webster v. Reprod. Health Serv.*, 492 U.S. 490, 526, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) (O'Connor, J., concurring). Therefore, because Arizona's citizens may "assert the right to choose as defined and articulated by the United States Supreme Court," *Simat*, 203 Ariz., at 463, ¶ 35, 56 P.3d at 37, we too "reach no conclusion about whether the Arizona Constitution provides a right of choice," *id.*

## II. THE UNDUE BURDEN TEST, NOT STRICT SCRUTINY, APPLIES IN THIS CASE.

¶ 16 Although we hold that the trial court based its decision on an incorrect application of the law, "we are obliged to affirm the trial court's ruling if the result was legally correct for any reason." *Gen. Elec. Capital Corp. v. Osterkamp*, 172 Ariz. 191, 193, 836 P.2d 404, 406 (App.1992). We therefore examine whether PPAZ has a likelihood of success on the merits of its claims under the correct legal standard.

¶ 17 Because *Simat* applied strict scrutiny under the state constitution to protect a federal right, we turn our attention to the standard of review under which these regulations must be evaluated. The trial court concluded that "[s]trict scrutiny is appropriate when 'the right that is to be affected is considered fundamental,'" citing *Simat; Roosevelt Elementary Sch. Dist. No. 66 v. Bishop*, 179 Ariz. 233, 877 P.2d 806 (1994); *Kenyon v. Hammer*, 142 Ariz. 69, 688 P.2d 961 (1984); and *Eastin v. Broomfield*, 116 Ariz. 576, 570 P.2d 744 (1977).

¶ 18 *Simat* did not hold that all regulations affecting fundamental rights are subject to strict scrutiny—it held that strict scrutiny applies to *discriminatory* regulations of fundamental rights. The regulations at issue here, however, do not discriminate against classes of people who seek to exercise a fundamental right. And while *Roosevelt*

---

6. For example, the Speaker urges us to resolve this matter by holding there is no right at all to an abortion under the Arizona Constitution and therefore no greater right than the federal right. However, the statutes before us do not purport to take away the right to an abortion in all circumstances. We therefore need not address the larg-

er constitutional question. *See In re United States Currency of $315,900.00*, 183 Ariz. 208, 211, 902 P.2d 351, 354 (App.1995) ("avoiding resolution of constitutional issues, when other principles of law are controlling and the case can be decided without ruling on the constitutional questions.")

noted that there is conflicting precedent regarding the level of scrutiny to be applied when fundamental rights are at stake, that court determined that it "need not ... resolve this conundrum" because more specific provisions of the Arizona Constitution were controlling. 179 Ariz. at 238, 877 P.2d at 811. Likewise, *Kenyon* cannot be read to hold that a statute that merely affects a fundamental right is automatically subject to strict scrutiny. Indeed, *Kenyon* acknowledged that "*Eastin* correctly applied the rational basis test" to those portions of a statute that "merely regulate" how a fundamental right may be exercised. 142 Ariz. at 83, 688 P.2d at 975; *accord Tahtinen v. Super. Ct.*, 130 Ariz. 513, 515, 637 P.2d 723, 725 (1981) (discussing *Eastin's* use of rational basis review of statutes that regulate a fundamental right, and holding "that unless a fundamental right is violated or an invidious classification is created, a statute impinging on the equal privileges and immunities of a class of Arizona residents will be upheld if it has a rational basis.").[7] Finally, our supreme court did not apply strict scrutiny to a statute that prohibited non-therapeutic abortions in some state-run hospitals, and upheld the statute because it did not "significantly interfere with the right of choice to have an abortion." *Roe v. Ariz. Board of Regents ("Regents")*, 113 Ariz. 178, 180, 549 P.2d 150, 152 (1976). The trial court therefore erred in concluding that strict scrutiny must be applied to any statute that affects the exercise of a fundamental right.[8]

¶ 19 Because we are reviewing statutes that affect an oft-litigated federal constitutional right and there is no Arizona law prescribing a standard of review for enforcement under the Arizona Constitution, we follow the federal standard. In *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the Supreme Court overruled previous decisions applying strict scrutiny to laws regulating abortion rights, acknowledging that those decisions "undervalue[d] the State's interest in the potential life within the woman," *id.* at 875, 112 S.Ct. 2791, and were inconsistent with the Court's "jurisprudence relating to all liberties" which "recognized [that] not every law that makes a right more difficult to exercise is, *ipso facto*, an infringement of that right," *id.* at 873, 112 S.Ct. 2791. Instead, the court held that a statute that affects abortion rights is not unconstitutional if "it serves a valid purpose, one not designed to strike at the right itself," and does not "impose[ ] an undue burden on a woman's ability" to exercise her rights. *Id.* at 874, 112 S.Ct. 2791.[9] In other words, "*Casey* thus requires courts to determine whether a large fraction of the women 'for whom the law is a restriction' will be 'deterred from procuring an abortion as surely as if the [government] has outlawed abortion in all cases.'" *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 370 (6th Cir.2006).

---

**7.** Our supreme court has held that the test for distinguishing between impingement upon and violation of a right is whether exercising the right is still a "reasonable election." *Barrio v. San Manuel Div. Hosp. for Magma Copper Co.*, 143 Ariz. 101, 106, 692 P.2d 280, 285 (1984).

**8.** It is well settled that not every law "affecting" the exercise of a fundamental right is subject to strict scrutiny. For example, time, place and manner restrictions on speech are not subject to strict scrutiny, though content-based restrictions are. *See, e.g., Hill v. Colorado*, 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (upholding statute that restricted protected speech within 100 feet of the entrance to a health-care facility under intermediate level of scrutiny).

**9.** In *Casey*, Justices O'Connor, Kennedy and Souter applied the "undue burden" test, 505 U.S. at 874, 112 S.Ct. 2791; Chief Justice Rehnquist and Justices White, Scalia and Thomas would have applied rational basis review, 505 U.S. at 966, 112 S.Ct. 2791 (concurring in part and dissenting in part); and Justices Stevens, 505 U.S. at 917, 112 S.Ct. 2791 (concurring in part and dissenting in part), and Blackmun, 505 U.S. at 923, 112 S.Ct. 2791 (concurring in part and dissenting in part), would have applied strict scrutiny. *Casey* therefore holds that the "undue burden" standard applies, because "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (internal citation omitted) (internal quotation marks omitted). The joint holding of *Casey* was reaffirmed by a majority of the Supreme Court in *Stenberg v. Carhart*, 530 U.S. 914, 946, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000).

¶ 20 One state supreme court has found an implied right to abortion in its state constitution and rejected the federal standard of review, applying instead strict scrutiny to regulatory statutes. *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 15–17 (Tenn.2000). There, the Tennessee Supreme Court rejected *Casey*'s "undue burden" test as "essentially no standard at all," which therefore would "allow[ ] judges to impose their own subjective views." *Id.* at 16.

¶ 21 We reject *Sundquist*'s characterization of the *Casey* standard. We also reject the notion that judges can be expected simply to default to their "subjective views" when faced with difficult questions. We join instead with other state courts that have applied the *Casey* standard. *See, e.g., Clinic for Women, Inc. v. Brizzi*, 837 N.E.2d 973, 987 (Ind.2005); *Pro-Choice Miss. v. Fordice*, 716 So.2d 645, 654–55, ¶ 34 (Miss.1998). Unlike the Tennessee court, we believe our courts are capable of properly applying the "undue burden" standard of *Casey*, just as they are capable of applying the "reasonableness" standard for intrusions on other protected privacy interests. *See, e.g., In re One 1965 Econoline*, 109 Ariz. 433, 434–36, 511 P.2d 168, 169–71 (1973) (Fourth Amendment prohibits "unreasonable" searches). Moreover, we find support for the *Casey* standard in *Barrio*, 143 Ariz. at 106, 692 P.2d at 285 (Feldman, J.), which held that a fundamental state constitutional right was not violated when the exercise of the right was still a "reasonable election"—an undue burden deprives a person of the reasonable election to exercise the right. We now apply *Casey*'s undue burden standard to the statutes in question.

### III. THE NOTARIZATION PROVISIONS OF A.R.S. § 36–2152(A) ARE NOT AN UNDUE BURDEN OR AN IMPERMISSABLE INVASION OF PRIVACY.

¶ 22 PPAZ contends that the notarization provisions of A.R.S. § 36–2152(A) violate the privacy rights [10] of both its minor patients seeking an abortion and their parents. These provisions in pertinent part require that:

> a person shall not knowingly perform an abortion on a pregnant unemancipated minor unless the attending physician has secured the written and ˙notarized consent from one of the minor's parents or the minor's guardian or conservator or unless a judge of the superior court authorizes the physician to perform the abortion.... [T]he notarized statement of parental consent and the description of the document or notarial act recorded in the notary journal are confidential and are not public records.

A.R.S. § 36–2152(A). By ensuring that the parent's signature is authentic, the notarization requirement furthers a legitimate state interest in ensuring that an unemancipated minor actually obtains her parent's consent to an abortion. *See Bellotti v. Baird*, 443 U.S. 622, 643–44, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (requirement of parental consent furthered a permissible end if adequate safeguards of the rights of the minor were present).

¶ 23 At the outset, we question PPAZ's standing to challenge these provisions on behalf of minor patients and their parents.[11] PPAZ has demonstrated neither a substantial relationship with the parents, nor that the parents could not assert their

---

**10.** Here "privacy" refers to information privacy and to the right to equal autonomy underlying the right to abortion. *See Casey*, 505 U.S. at 884, 112 S.Ct. 2791 ("[T]he two more general rights under which the abortion right is justified [are] the right to make family decisions and the right to physical autonomy."); *accord Gonzales v. Carhart*, 550 U.S. 124, 172, 127 S.Ct. 1610, 167 L.Ed.2d 480, (2007) (Ginsberg, J., dissenting) ("[C]hallenges to undue restrictions on abortion procedures do not seek to vindicate some generalized notion of privacy; rather, they center on a woman's autonomy to determine her life's

course, and thus to enjoy equal citizenship stature.").

**11.** We may examine *sua sponte* whether a party has standing to pursue a claim. *Allen v. Sullivan*, 139 Ariz. 142, 143, 677 P.2d 305, 306 (App. 1984). We "consistently" have required standing because it "sharpens the legal issues presented by ensuring that true adversaries are before the court and thereby assures that our courts do not issue mere advisory opinions." *Sears v. Hull*, 192 Ariz. 65, 71, ¶ 24, 961 P.2d 1013, 1019 (1998).

rights on their own behalf.[12] Moreover, while PPAZ's challenge purports to seek protection of the parents' right to privacy, it simultaneously seeks to weaken a provision that in many cases will protect the parents' fundamental right to control the upbringing of their children. *See Jordan v. Rea,* 221 Ariz. 581, 587–88, ¶ 14, 212 P.3d 919, 925–26 (App.2009). PPAZ has not shown that the parents have a unified interest in the outcome of this litigation, nor has it shown that it is a proper party to balance these interests on the parents' behalf.

¶ 24 Even assuming that PPAZ has standing, however, its facial challenge would fail as a matter of law. To guide our analysis, we look to the analysis of Arizona's judicial bypass procedure in *Planned Parenthood of S. Ariz. v. Lawall,* 307 F.3d 783 (9th Cir.2002). There the Ninth Circuit addressed both the privacy interest underlying the right to abortion, *id.* at 786–89, and the privacy interest in "avoiding disclosure of sensitive personal information" to the government or the public, *id.* at 789–90. The Ninth Circuit first held that because Arizona's judicial bypass procedure required that records of the proceedings "not be made public" and imposed criminal sanctions for unauthorized disclosures, it "reasonably preserve[d]" the confidentiality of the minor's information and therefore was not an undue burden on the minor's right to an abortion. *Id.* at 789. Turning to the disclosure of sensitive personal information, the Ninth Circuit balanced the state's interests against the potential harm to the minor, and held that because the risk of disclosure and resulting harm was "remote," the statute was not an impermissible invasion of privacy. *Id.* at 789–90.

¶ 25 In applying *Lawall,* we first consider the potential harm that flows from notarial disclosure, both to determine the burden imposed by the requirement, *see Casey,* 505 U.S. at 892–94, 112 S.Ct. 2791, and to balance the relevant privacy interests against the interests of the state, *Lawall,* 307 F.3d at 790. The intrusion into private affairs required in a judicial bypass proceeding, where the competency and best interests of the minor must be determined, *Ohio v. Akron Ctr. for Reprod. Health,* 497 U.S. 502, 511–12, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) (*Akron II* ), is far greater than the bare knowledge of a notary that the minor obtained parental consent for an abortion. And because the minor employing the procedure has her parent's consent, the potential injury arising from disclosure has one less component than when a minor obtains judicial authorization for an abortion without her parent's knowledge. *See Bellotti,* 443 U.S. at 647, 99 S.Ct. 3035 (holding judicial bypass procedures must not require parental notification because of the vulnerability of unemancipated minors); *see also Casey,* 505 U.S. at 892–94, 112 S.Ct. 2791 (holding spousal notification unconstitutional based on the possible domestic consequences in dysfunctional marriages).

¶ 26 A.R.S. § 36–2152(A) provides that "the notarized statement of parental consent and the description of the document or notarial act recorded in the notary journal are confidential and are not public records." Notaries are public officers, A.R.S. § 41–312(C), and as such "shall not disclose or use, without appropriate authorization, any information that is acquired ... in the course of the [notary's] official duties and that is declared confidential by law." A.R.S. § 38–504(B). Intentionally or knowingly violating § 38–504(B) is a class 6 felony; recklessly or negligently violating it is a class 1 misdemeanor. A.R.S. § 38–510(A). These potential penalties adequately protect against disclosure by the notary. *See Lawall,* 307 F.3d at 787 (citing *Akron II,* 497 U.S. at 512, 110 S.Ct. 2972).

¶ 27 On appeal, PPAZ argues that this protection ends when a notary's commission ends and the notary's confidential log is turned over to his or her employer,[13] arguing that no statute prohibits the employer from

12. In federal cases, Planned Parenthood physicians have been permitted to assert the abortion rights of their patients because of the closeness of the physician-patient relationship, the effectiveness of the physician as the patients' advocate, the necessary involvement of physicians in abortions, and the obstacles to a woman asserting her own abortion rights. *Singleton v. Wulff,* 428 U.S. 106, 114–17, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

13. A.R.S. § 41–319(E).

then disclosing the contents of the confidential log.[14] The absence of statutory protection, however, does not mean that the employer would be immune from civil liability for invasion of privacy. *Reed v. Real Detective Publ'g Co.*, 63 Ariz. 294, 304–05, 162 P.2d 133, 138 (1945). And parents may use a notary whose employer has promised to keep the information confidential, such as PPAZ itself.[15] We therefore conclude that the risk that a notary's employer might publicly disclose the parental consent is sufficiently attenuated as to not impose an undue burden.

¶ 28 Next, balancing these protections and risks against the minor's interest in nondisclosure of sensitive private information, we recognize that the protections afforded here are less formal than those afforded in a judicial bypass proceeding. But we also recognize that the possibility of disclosure is remote, and unlike in a judicial bypass proceeding, intimate details of the patient's life—apart from the bare fact of the abortion—are not part of the record. *See In re Crawford*, 194 F.3d 954, 959 (9th Cir.1999) (consequences of disclosure "must be discounted by the probability of its occurrence"). We therefore hold that the balance of interests favors the state, and that the notarization requirement is not an impermissible invasion of this privacy interest.

¶ 29 PPAZ also argues that notarization furthers no state interest because the authenticity of a parental consent is adequately protected by the civil and criminal penalties imposed by A.R.S. § 36–2152(I) and (J). However, these penalties only apply when an abortion provider *knowingly* performs an abortion without parental consent, A.R.S. § 36–2152(A), and fail to protect against forged parental signatures that a minor creates or falsely obtains without the provider's knowledge.

¶ 30 Finally, PPAZ contends that the notarization requirement violates the rights of parents who have no acceptable identification

and must therefore rely on a third party to establish their identity, "requiring" them to "disclose their daughter's very private abortion decision" to that third party. A.R.S. § 41–311(11) provides that a signatory may be identified by the oath or affirmation of a "credible person" who (1) personally knows the individual and (2) is personally known to the notary or provides satisfactory evidence of his or her own identity. There is no requirement that the "credible person" have any knowledge of the document being notarized.

¶ 31 Because we find no legal merit to PPAZ's challenge, we vacate the injunction against enforcement of the notarization requirement.

## IV. PPAZ'S CHALLENGE UNDER ARTICLE 2, SECTIONS 8 AND 13, TO THE "ORALLY AND IN PERSON" AND "BY A PHYSICIAN" COUNSELING REQUIREMENTS CANNOT SUCCEED.

¶ 32 Arizona law requires that, except in cases of a medical emergency, a woman seeking an abortion must receive certain information at least twenty-four hours before the abortion. A.R.S. § 36–2153(A). PPAZ challenges the requirements that some[16] of that information be provided in person and by a physician. A.R.S. § 36–2153(A)(1), (2).

¶ 33 Such requirements were upheld in *Casey*. While acknowledging the burdens that arose from a statute whose practical effect was "often [ ] a delay of much more than a day" because a woman seeking an abortion must make "two visits to the doctor," the justices held the statute did not violate the federal constitution because it did not impose an "undue burden." *Casey*, 505 U.S. at 885–86, 112 S.Ct. 2791. It was expressly contemplated in *Casey* that patients would receive the required preliminary con-

---

**14.** PPAZ's contention that the employer can access the confidential log "at any time" during the term of the notary's commission is contrary to the prohibition on disclosure in A.R.S. § 38–504.

**15.** The Planned Parenthood organizations in Arizona currently employ 24 notaries.

**16.** E.g., PPAZ challenges the requirement that a *physician* provide information about pharmacological abortion even though those abortions are routinely performed by registered nurse practitioners or physician's assistants.

sultation in person. *Casey* also upheld the requirement that some information be provided by a physician, holding that "the Constitution gives the States broad latitude to decide that particular functions may be performed only by licensed professionals, even if an objective assessment might suggest that those same tasks could be performed by others." *Id.* at 885, 112 S.Ct. 2791.

¶ 34 Our first step in the "undue burden" analysis is to determine whether the provisions further a state interest. Courts have long recognized that "eye-to-eye, face-to-face" interaction is superior to even videoconferencing. *See, e.g., State v. Vess,* 157 Ariz. 236, 238, 756 P.2d 333, 335 (App.1988) (use of closed-circuit testimony for child witness "must be justified by necessity," acknowledging that observing a person's demeanor enhances communication); *Maryland v. Craig,* 497 U.S. 836, 845–46, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) (observation of witness's demeanor helps ensure reliability of testimony); *accord Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 39 L.Ed. 409 (1895). Therefore, the legislature could reasonably conclude that telephonic consultation was inferior to in-person consultation during which the interviewer could perceive the condition and comportment of the patient, in furtherance of the state's interest in the woman's health.

¶ 35 The legislature could also reasonably conclude that consultation with a physician was superior to consultation with a nonphysician. *See Bellotti,* 443 U.S. at 643, 99 S.Ct. 3035 (prescribing judicial alternative to parental consent; "A pregnant minor is entitled in such a proceeding to show ... that she is mature enough and well enough informed to make her abortion decision, *in consultation with her physician* ....") (emphasis added); *Williamson v. Lee Optical of Okla.,* 348 U.S. 483, 487, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (upholding a potentially "needless, wasteful requirement" that opticians obtain a prescription from an ophthalmologist or optometrist before duplicating lenses, because the legislature might have concluded the involve-

ment of the ophthalmologist or optometrist might occasionally prevent some harm); *see also Roschen v. Ward,* 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722 (1929) (Holmes, J.) (upholding a New York law requiring that an optometrist be present in any store selling eyeglasses). This provision falls well within the state's "broad latitude to decide that particular functions may be performed only by licensed professionals," *Casey,* 505 U.S. at 885, 112 S.Ct. 2791, in this case to further the state's interest in protecting the woman's health. This interest extends to what PPAZ characterizes as the "often [ ] very important and personal" choice between pharmacological and surgical abortion. The state could easily conclude that because "physicians are better qualified ... to impart this information and answer questions about the medical aspects of the available alternatives," [17] such an important choice should be made in consultation with a physician.

¶ 36 Having established that these requirements serve a valid purpose, we determine the class of women they affect. Because it is clear that they affect all women seeking abortion, or in the case of women for whom pharmacological abortion is an option, women seeking an abortion during the first nine weeks of pregnancy, we discern no classification that could be perceived as discriminatory.

¶ 37 Finally we examine whether the provisions operate to deny a large fraction of the class of affected women their abortion rights. First, the requirement that physicians provide counseling may increase the expense of abortions, and may burden PPAZ by requiring it to hire more physicians. But it does not practically deny a large fraction of the affected women their right to choose an abortion, as the spousal notification requirement struck down in *Casey* did, and as the ban on an abortion procedure did in *Stenberg.* And PPAZ has not rebutted the implicit legislative fact that sufficient physicians can be enlisted to provide this service. We therefore conclude that PPAZ's facial challenge to this provision cannot succeed.

---

17. *Casey,* 505 U.S. at 968, 112 S.Ct. 2791 (Rehnquist, C.J., concurring in the judgment in part and dissenting in part) (agreeing that statute requiring that certain information be provided by a physician was constitutional).

¶ 38 Regarding the in-person counseling provision, PPAZ argues that in-person counseling imposes a burden of additional travel, expense and delay. PPAZ's speculation about the impact of these burdens is insufficient to support a conclusion as a matter of law that the requirement would operate effectively to deny a large fraction of affected woman their abortion rights. As a result, PPAZ's facial challenge to this provision does not carry the likelihood of success necessary to justify the injunction.[18]

## V. PPAZ'S CHALLENGE TO THE PHYSICIANS—ONLY REQUIREMENT FOR SURGICAL ABORTIONS CANNOT SUCCEED.

¶ 39 PPAZ challenges the requirement that "[a]n individual who is not a physician shall not perform a surgical abortion." A.R.S. § 36–2153(C). PPAZ argues that because registered nurse practitioners (RNPs) have a comparable safety record when performing some surgical abortions, the requirement does not further the state's interest in ensuring that abortions are performed safely.

¶ 40 This provision does not infringe on any federally protected abortion right: "Even during the first trimester of pregnancy," when the state's interests are weakest, "prosecutions for abortions conducted by nonphysicians infringe upon no realm of personal privacy secured by the Constitution against state interference." *Connecticut v. Menillo*, 423 U.S. 9, 11, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975) (per curiam). And the Supreme Court has "left no doubt that, to ensure the safety of the abortion procedure, the States may mandate that only physicians perform abortions." *Mazurek v. Armstrong*, 520 U.S. 968, 974–75, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997). In *Mazurek*, the Supreme Court held that the plaintiffs—who alleged that a Montana statute restricting the performance of abortions to licensed physicians imposed an undue burden—were not

entitled to preliminary injunctive relief, *id.* at 972, 117 S.Ct. 1865, even though plaintiffs provided evidence that nonphysicians had been performing surgical abortions with comparable complication rates, *id.* at 973, 117 S.Ct. 1865. In so holding, the Supreme Court reiterated that states had broad authority to restrict the performance of some functions to licensed professionals "even if an objective assessment might suggest that those same tasks could be performed· by others." *Id.* (quoting *Casey*, 505 U.S. at 885, 112 S.Ct. 2791).[19]

¶ 41 We agree with *Menillo* that no privacy rights, state or federal, are implicated by requiring that a surgical procedure be performed by a physician. And as in *Mazurek*, we hold that such a requirement does not violate Arizona's constitution absent a showing of improper purpose. Accordingly, PPAZ's facial challenge to the provisions that prohibit nonphysicians from performing surgical abortions cannot succeed.

## VI. PPAZ'S CHALLENGE TO THE RIGHT OF REFUSAL PROVISIONS CANNOT SUCCEED.

¶ 42 Although the trial court only enjoined the 2009 amendments to A.R.S. § 36–2154, PPAZ challenged it in its entirety. A.R.S. § 36–2154 reads:

A. A hospital is not required to admit any patient for the purpose of performing an abortion. A physician, or any other person who is a member of or associated with the staff of a hospital, or any employee of a hospital, doctor, clinic or other medical or surgical facility in which an abortion has been authorized, who states in writing an objection to the abortion on moral or religious grounds is not required to facilitate or participate in the medical or surgical procedures that will result in the abortion.

B. A pharmacy, hospital or health professional, or any employee of a pharmacy,

---

**18.** In its briefing, PPAZ declined to contest the statutes' constitutionality under the "undue burden" standard, arguing only that "there is no legal basis" for applying that standard.

**19.** The Supreme Court premised this holding on the failure of the plaintiffs to show that the

restriction had been enacted for an improper purpose. *Id.* at 973, 112 S.Ct. 2791. PPAZ does not contend that the Arizona Legislature enacted the similar provisions at issue here for an improper purpose.

hospital or health professional, who states in writing an objection to abortion, abortion medication, emergency contraception or any medication or device intended to inhibit or prevent implantation of a fertilized ovum on moral or religious grounds is not required to facilitate or participate in the provision of an abortion, abortion medication, emergency contraception or any medication or device intended to inhibit or prevent implantation of a fertilized ovum. The pharmacy, hospital or health professional, or an employee of the pharmacy, hospital or health professional, shall return to the patient the patient's written prescription order.

¶ 43 The state contends that PPAZ has no standing to challenge the law. However, the statute establishes the public policy of Arizona, and although the question is not before us now, PPAZ faces potential employment litigation with employees who might be fired for a refusal pursuant to its provisions. *See Galati v. Am. W. Airlines, Inc.,* 205 Ariz. 290, 292 n. 2, ¶ 5, 69 P.3d 1011, 1013 n. 2 (App.2003) (statutes create public policy); A.R.S. § 23–1501(3)(b) (employee fired in violation of public policy has a claim for wrongful termination). Therefore, as an employer of persons covered by the statute's provisions, PPAZ may face a cognizable legal detriment and has standing to challenge the statute.

■ ¶ 44 PPAZ argues that the refusal provisions violate a woman's right to an abortion. However, that argument is foreclosed by our supreme court's decision in *Regents.* There, a pregnant woman challenged a statute which prohibited abortions at "any facility under the jurisdiction of the board of regents," in that case the University Hospital, unless necessary to save the life of the pregnant woman. *Regents,* 113 Ariz. at 178, 549 P.2d at 150. Because the plaintiff did not demonstrate that the University Hospital was the only reasonable choice available to provide the abortion, the court held that the statute did not significantly interfere with her right to choose to have an abortion. *Id.* at 180, 549 P.2d at 152. The court explained that:

The whole matter is in reality a matter of preference. Even as plaintiff does not have an absolute right to an abortion on demand, she also does not have the right to select any public facility she chooses for an abortion. If there are alternate adequate public facilities available to her, her right of choice has been protected, and she cannot complain that she would rather have a different facility.

*Id.* Even a state actor can refuse to facilitate an abortion, as long as the woman is not effectively denied her right to an abortion as a result.

■ ¶ 45 Moreover, any reproductive rights that might exist under Article 2, Sections 8 or 13, can only be asserted against governmental acts, not the decisions of private individuals. *Hart v. Seven Resorts Inc.,* 190 Ariz. 272, 276–77, 947 P.2d 846, 850–51 (App.1997) (Article 2, Section 8 does not apply to acts of private individuals); *Kahn v. Thompson,* 185 Ariz. 408, 413, 916 P.2d 1124, 1129 (App.1995) (equal protection challenge under Article 2, Section 13 "is not applicable to conduct between private parties"). Therefore a woman's right to an abortion or to contraception does not compel a private person or entity to facilitate either. We therefore hold that PPAZ's facial challenge to the refusal provisions of A.R.S. § 36–2154 on the grounds that they violate Article 2, Sections 8 or 13, cannot succeed.

¶ 46 In its arguments below, PPAZ also contended the statutes would "thwart women's ability to chart their own medical course." As explained above, whatever right a woman may have to "chart her own medical course," it cannot compel a health-care provider to provide her chosen care.

■ ¶ 47 PPAZ also argues here as below that the statute "allows[s] medical professionals to abandon their patients, even in an emergency." We do not read the statute so broadly. Under the common law, a physician who fails to provide the "standard of care" to a patient—"the same care ... exercised by other physicians of the same class in the community in which he practiced"—has committed a breach of duty and may be liable for malpractice. *Seisinger v. Siebel,* 220 Ariz. 85, 94, ¶¶ 32–33, 203 P.3d 483, 492

(2009); *see also* A.R.S. § 12–563. As an action for damages originating in the common law, medical malpractice falls within the scope of Article 18, Section 6, of the Arizona Constitution, which "prevents abrogation of all ... actions in tort which trace origins to the common law." *Duncan v. Scottsdale Med. Imaging, Ltd.*, 205 Ariz. 306, 313, ¶ 28, 70 P.3d 435, 442 (2003). When interpreting a statute, we construe it to be constitutional if at all possible, avoid overbroad interpretations in derogation of common-law rights of action, and as a rule look for explicit expression of legislative intent before concluding the legislature intends to deny a common-law action. *Hayes v. Continental Ins. Co.*, 178 Ariz. 264, 272–73, 872 P.2d 668, 676–77 (1994). Therefore, we conclude that the statute does not excuse medical malpractice or eliminate the common-law duty of healthcare providers to provide the standard of care owed to their patients. PPAZ's challenge to the statute therefore cannot succeed on this ground.

¶ 48 PPAZ also argues that the statute violates Article 2, Section 12, sentence 1, of the Arizona Constitution, which provides that "The liberty of conscience secured by the provisions of this constitution shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace and safety of the state." PPAZ claims that the statute violates the "peace and safety of the state" provision of that section, but cites no precedent, either in Arizona or in a state with a similar constitutional provision, holding that this part of the constitution establishes a private right of action. And no authority suggests that permitting individuals to choose whether to facilitate abortions places the peace and safety of the state at risk.

■■■■ ¶ 49 To determine whether this constitutional provision could support PPAZ's challenge,

> we first examine the plain language of the provision involved. If the constitutional provision is clear on its face and is logically capable of only one interpretation, we simply follow that text. When a constitutional or statutory provision is not clear, we may look to the context, subject matter, historical background, effects, consequences, spirit, and purpose of the law. Finally, we strive to interpret a constitutional provision or statute in a manner that gives meaning to all of its language.

*Chavez v. Brewer*, 222 Ariz. 309, 319, ¶ 32, 214 P.3d 397, 407 (App.2009). Here the plain language of the text is dispositive. Article 2, Section 12, sentence 1 provides limitations on the liberty of conscience protected by the Arizona Constitution by defining what it does not protect. It is therefore a limitation on the judiciary's authority to "say what the law is," *Chavez*, 222 Ariz. at 316, ¶ 18, 214 P.3d at 404 (citation omitted), but does not limit the legislature's authority to enact statutes that provide greater protections to individual liberty of conscience than those provided in the constitution. As a result, this sentence of the constitution does not provide a basis upon which PPAZ can challenge the constitutionality of A.R.S. § 36–2154.

¶ 50 We therefore hold that PPAZ cannot succeed in its facial challenge to A.R.S. § 36–2154 on the grounds it has presented.

## VII. INTERVENTION

¶ 51 The trial court denied intervention to the Speaker of the Arizona House of Representatives, who sought it under Rule 24(a)(1), and to other parties seeking intervention under Rules 24(a)(2) and 24(b)(2). On appeal, the putative intervenors do not contend they should have been permitted to intervene under Rule 24(b). That claim is therefore waived. *Schabel v. Deer Valley Unified Sch. Dist. No. 91*, 186 Ariz. 161, 167, 920 P.2d 41, 47 (App.1996).

¶ 52 Rule 24(a) allows intervention as of right

> (1) when a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

¶ 53 "In reviewing a denial of intervention, we will accept as true the allegations of the motion." *Saunders v. Super. Ct.*, 109 Ariz. 424, 425, 510 P.2d 740, 741 (1973). We determine de novo whether an applicant may intervene as of right under Rule 24(a). *Dowling v. Stapley*, 221 Ariz. 251, 269–70, ¶ 57, 211 P.3d 1235, 1253–54 (App. 2009). "Rule 24 is remedial and should be construed liberally in order to assist parties seeking to obtain justice in protecting their rights." *Id.* at 270, ¶ 58, 211 P.3d at 1254.

¶ 54 It is uncontested that the motions to intervene were timely. We address each set of similarly situated parties in turn.

A. *The Speaker of the House May Intervene as of Right.*

¶ 55 Since the inception of this suit, A.R.S. § 12–1841 was amended to provide that "[t]he attorney general, the speaker of the house of representatives or the president of the senate, in the party's discretion, may intervene as a party" in any suit in which "a state statute, ordinance, franchise or rule is alleged to be unconstitutional." 2010 Ariz. Sess. Laws, ch. 105, § 1 (2d Reg. Sess.). Because the right to intervene is "primarily procedural in nature ... for retroactivity purposes," *State Comp. Fund v. Fink*, 224 Ariz. 611, 614, ¶ 14, 233 P.3d 1190, 1193 (App.2010), the amendment applies to all actions that are still subject to further appeal. *DeVries v. State*, 219 Ariz. 314, 320, ¶ 14, 198 P.3d 580, 586 (App.2008).

¶ 56 We therefore need not decide whether the trial court erred in denying the speaker's Motion to Intervene under the 2006 version of the statute. It is uncontroverted the speaker's motion to intervene was timely. Therefore we hold that the speaker may now intervene as of right pursuant to Rule 24(a)(1).

B. *Ave Maria Pharmacy, Christian Medical and Dental Associations, Christian Pharmacists Fellowship International, American Association of Pro–Life Obstetricians and Gynecologists, and Catholic Medical Association May Intervene Regarding the Conscientious Refusal Provisions.*

¶ 57 Ave Maria Pharmacy, Christian Medical and Dental Associations, Christian Pharmacists Fellowship International, American Association Of Pro–Life Obstetricians and Gynecologists, and Catholic Medical Association claim to be or to represent healthcare professionals in Arizona whose liberty of conscience rights are protected under the challenged provisions of A.R.S. § 36–2154. This is a protectable interest, and we assume the truth of the allegations made in support of their claims.

¶ 58 PPAZ argues that these parties are adequately represented by the state. We disagree. The state must represent the interests of all people in Arizona, some of whom might be adversely affected by these applicants' exercise of the rights protected by the provision. As a result, the state might not give these applicants' interests "the kind of primacy" that these applicants would. *See Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C.Cir.2003). Because it cannot be said that the state necessarily represents these applicants, they should have been permitted to intervene on issues regarding the right of refusal.

C. *Arizona Catholic Conference Has No Interest That Supports Intervention Under Rule 24.*

¶ 59 Arizona Catholic Conference ("ACC") claims that as a public interest organization that lobbied for passage of the challenged legislation, it should be permitted to intervene. ACC admits that no Arizona case law supports this proposition. Instead ACC offers cases in which sponsors and supporters of ballot initiatives were allowed to intervene. *Ruiz v. Hull*, 191 Ariz. 441, 446, ¶ 12, 957 P.2d 984, 989 (1998); *Transamerica Title Ins. Co. v. City of Tucson*, 157 Ariz. 346, 347, 757 P.2d 1055, 1056 (1988). Neither case explains the rationale for intervention, and we perceive a substantial difference between those who act to secure passage of a law by the voters and those who merely express their views to the elected members of the legislature. We conclude that these cases do not support ACC's intervention here.

¶ 60 ACC cites two federal cases as holding that "a public interest group is entitled as

a matter of right to intervene in an action challenging the legality of a measure it has supported." *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir.1995); *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 527 (9th Cir.1983). We agree that these cases stand for the proposition cited. But they also incorporate a four-part test that the court must employ to determine whether intervention as of right should be allowed:

> (1) the applicant's motion must be timely; (2) the applicant must assert an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that without intervention the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the other parties.

*Sagebrush*, 713 F.2d at 527. *See also Idaho Farm Bureau*, 58 F.3d at 1397. Here, we conclude that while AAC satisfies the first three prongs of the test, it has not demonstrated that its interests will be inadequately served by the representation provided by the Attorney General. The Attorney General has been charged with upholding the constitutionality of the statute, and AAC has identified no aspects of its own interests as a supporter of the challenged legislation that will be inadequately represented by the state. We therefore conclude that the application for intervention was properly denied.

### D. *Crisis Pregnancy Centers of Greater Phoenix Has No Protectable Interest That Would Support Intervention.*

¶ 61 Crisis Pregnancy Centers of Greater Phoenix ("CPC") alleges it has an interest "in ensuring that women receive full information about the availability of services" from themselves and others like them. It contends that interest would be jeopardized if PPAZ succeeds in its suit.

¶ 62 PPAZ does not challenge those provisions of the statute that mandate what information must be provided to a woman seeking an abortion, but instead only challenges who must provide the information and in what manner. CPC has therefore failed to identify an interest it has that is affected by this litigation, and the court did not err in denying CPC's motion to intervene.

### E. *Gray and Barto Have No Protectable Interest.*

¶ 63 State Senator Linda Gray and State Representative Nancy Barto sponsored the legislation being challenged. Each claims a "legislative interest" in protecting their efforts and their votes to pass the bill.

¶ 64 Outside the narrow scope of legislative procedure, no authority has been cited for the proposition that legislators have a protectable interest in upholding or challenging the constitutionality of legislation.[20] Moreover, A.R.S. § 12–1841 expresses the intent of the legislature that the Speaker of the House and the President of the Senate perform that function on behalf of their respective bodies.

¶ 65 We therefore hold that the trial court did not err in denying Gray and Barto's motion to intervene.

### CONCLUSION

¶ 66 We hold that the statutes affected by the preliminary injunction are constitutional, and we therefore vacate the injunction in its entirety. On remand, we direct the trial court to grant the motions for intervention of the Speaker of the House, Ave Maria Pharmacy, Christian Medical and Dental Associations, Christian Pharmacists Fellowship International, American Association of Pro-Life Obstetricians and Gynecologists, and Catholic Medical Association. We affirm the denial of intervention to the other applicants.

---

**20.** *See Raines v. Byrd*, 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (individual congressmen lacked sufficient personal stake to challenge Line Item Veto Act). *Cf. Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) (legislators had interest in suit to determine whether lieutenant governor's tie-breaking vote to adopt amendment to the federal constitution was authorized). *See Chenoweth v. Clinton*, 181 F.3d 112 (D.C.Cir.1999) (discussing the case law).

We remand for further proceedings consistent with this opinion.

CONCURRING: DANIEL A. BARKER and MICHAEL J. BROWN, Judges.